**STATE of Minnesota, Respondent,**

v.

**Ellis OLKON, Appellant.**

**No. 50966.**

Supreme Court of Minnesota.

Aug. 29, 1980.

Rehearing Denied Sept. 29, 1980.

Certiorari Denied Jan. 26, 1981.
See 101 S.Ct. 954.

**90**

Collins, Buckley, Sauntry & Haugh, Theodore J. Collins and Dennis W. Hagstrom, St. Paul, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Asst. County Atty., Chief, App. Div., David W. Larson, Asst. County Atty., Minneapolis, for respondent.

TODD, Justice.

Defendant, Ellis Olkon, was charged with two counts of conspiracy to commit theft by swindle over $2,500 and two counts of attempted theft by swindle over $2,500. These charges were brought after defendant Olkon collected monies from two insurance companies for the purported automobile accident injuries of a client even though he was apprised that the client was not in fact injured. The client, who unbeknown to defendant was an undercover police officer, had requested that defendant act as his attorney in presenting the false claims to the insurance companies. Prior to trial, defendant moved to dismiss the indictment on the ground that prosecutorial misconduct had occurred during the grand jury proceedings and on the ground that the indictment was multiplicious. These motions were denied. Defendant waived a jury trial on the defense of entrapment. Therefore, the defense was tried before the court at the omnibus hearing. The trial court determined that defendant was not entrapped into the commission of any offense. After a jury trial, the jury returned a verdict of guilty on the two counts of attempted theft by swindle but was unable to reach a verdict on the two counts of conspiracy. Subsequent to trial, a Schwartz hearing was held because there had been allegations of juror misconduct. Defendant moved for a new trial and, in the alternative, for a judgment of acquittal. These motions were denied and judgment was entered against defendant. We affirm.

In early 1978, Walter Powers, a Hennepin County police officer who worked often on undercover narcotics investigations, was requested by Hennepin County Detective John Meath to take part in an undercover investigation of medical fraud activities. As a part of this plan, Deputy Powers established a doctor-patient relationship with Dr. Robert Coifman, a medical fraud suspect, by consulting with Dr. Coifman on three occasions for Powers' purported allergy problems. Deputy Powers identified himself to Dr. Coifman as "Eugene Bowers", the cover name which Powers was to use throughout the investigation. During some of these visits, Powers–Bowers was accompanied by Deputy Sheriff Pamela Lavarre, who used the cover name of "Elizabeth Saunders" and who posed as the girlfriend of Bowers.

On June 16, 1978, Powers–Bowers and Lavarre–Saunders went to Dr. Coifman's office and told Coifman that they had been in a car accident the night before. Powers–Bowers complained of lower back pain but did not receive any treatment during that visit or during his next visit to Dr. Coifman. Dr. Coifman and his business manager, Nathan Neff, discussed the possibility of therapy and the wearing of a neck brace with Powers–Bowers. On June 20, Powers–Bowers and Lavarre–Saunders returned to Dr. Coifman's office and only saw Neff, who referred them to defendant Olkon, a Minneapolis lawyer, for legal assistance.[1] The police department had not intended to investigate Olkon until Neff made this reference.

Prior to the June 16 visit with Dr. Coifman, Powers–Bowers was issued a driver's license and a Hennepin County welfare card in his fictitious name. With the cooperation of the Edina Police Department, a fictitious police accident report was prepared on a standard Department of Public Safety form. The report indicated that Bowers and Saunders, while driving in a 1977 Ford van, were rear ended by one Joseph Barnes at 1:10 a. m. on June 16, 1978, and that property damage of $700 and physical injuries resulted from the accident. Powers–Bowers was also listed, in his fictitious name, as the owner of the van involved in the accident and was given a falsified repair bill for the van in the amount of $313.60. State Farm Mutual Insurance Company, at the request of the Hennepin County Sheriff's Department, provided Bowers with insurance coverage which included personal injury protection. The Travelers Insurance Company, the insurer of Joseph Barnes, and State Farm were fully informed of the fictitious nature of the accident and of the investigation plan. The insurance companies were requested to settle without contest any claims made against them on behalf of Bowers. The Hennepin County Sheriff's Department also contacted the Hennepin County Medical Society and requested that they delay the filing of charges against Dr. Coifman for about 30 days.

On June 22, 1978, Powers–Bowers called defendant's office to make an appointment with defendant. The conversation which ensued and subsequent calls to and interviews in the Olkon office were tape recorded by Powers–Bowers by means of a small transmitter and receiver. Powers–Bowers spoke with Debra Juhl, defendant's paralegal secretary. He identified himself as Eugene Bowers and told her that he had been referred to Olkon by Nathan Neff, that he had been involved in a car accident, and that he and Saunders had been injured and were in treatment with Dr. Coifman. Juhl contacted Bowers later that day and gave Bowers an appointment to see defendant the following Monday. Powers–Bowers agreed to come unless he was admitted into the hospital in the interim.

On the afternoon of Monday, June 26, 1978, Powers–Bowers and Lavarre–Saunders went to defendant's law office. They were casually dressed and Powers–Bowers

---

1. Neff had first given Powers–Bowers and Lavarre–Saunders the name of a different attorney but Powers–Bowers did not go to see that attorney because he thought that the attorney might recognize him as a police officer. Therefore, he asked Neff for the name of another attorney and was referred to defendant.

wore a neck brace or "soft collar." They were met by Debra Juhl who had them execute legal retainer agreements and medical release forms. Powers–Bowers gave Juhl a copy of the police accident report. Juhl testified at trial that Powers–Bowers moved stiffly, appeared to be in pain, and gave no indication that he was not an injured person.

Powers–Bowers and Lavarre–Saunders then went into defendant's office. They identified themselves to defendant as Bowers and Saunders, indicated that they were cohabiting, and told defendant they were unemployed. They described the accident to defendant and gave him insurance information. Lavarre–Saunders indicated that she had pain in her shoulders and lower neck and had headaches. Powers–Bowers stated that he had lower back pain and would be hospitalized. They also discussed their treatment with Dr. Coifman and defendant expressed skepticism concerning Dr. Coifman because his bills were high and because he treated patients with hypnotherapy, a procedure not highly recommended by the medical profession. At this meeting, the following also transpired ("O" represents Olkon, "P" represents Powers–Bowers):

O: You don't look sick. But with Coifman on, anybody's sick. Is something really wrong with you?

P: Ah, well, not really. But they decided that I should ah–that I maybe I could get something out of it. So they said I should come and see ya.

O: Well, I don't want to know anything about that.

P: Then I won't tell you anything about that.

 \* \* \* \* \* \*

O: Ah, what I am concerned about is because under no fault insurance, you need one of three things, in order to qualify for a – for a personal injury lawsuit. 1 – you have to lose at least 2 months from work, but that's not gonna be the case, as neither one of you were working at the time of the accident. Or – 2 – if you

have ah, up to $4,000 worth of medical bills, or hospital medication bills, which if you see Coifman, won't be a problem. I mean, I, I, I've never met that guy, and I don't want to meet him, but, ah, I guess I don't want to look a gift horse in the mouth. Cause I'm unhappy with him, ya know. And the third thing is to have a permanent injury and that you'll probably have, cause Coifman finds permanent injury.

 \* \* \* \* \* \*

O: You're hurting, in pain, possibly hospitalized.

P: Don't laugh.

After this meeting, defendant notified the Travelers Insurance Company that an accident had taken place and that a possible cause of action existed. Defendant also informed State Farm of the accident and indicated that State Farm should deal directly with their insured, Bowers. Defendant forwarded to the insurance companies the accident report and repair bill.

In March and early July 1978, Debra Juhl called the Hennepin County Medical Society and asked whether there were any complaints against Dr. Coifman regarding his overcharging for services. Juhl was informed that Dr. Coifman was a member in good standing of the society.

On August 15, 1978, Powers–Bowers was admitted to the Metropolitan Medical Center by Dr. Coifman. While there, Powers–Bowers underwent treatment for lower back pain. He was also examined by Dr. Joseph Engel, a consulting psychiatrist who had no relationship to Dr. Coifman. As a result of this examination, Dr. Engel concluded that Bowers had a minor spine sprain and nerve root irritation. His consultation report indicated his diagnosis:

Diagnosis is lumbar spine sprain with a mild right sided radiculitis and a cervical spine block sprain of a milder extent.

Dr. Engel also reported to State Farm that Bowers had a mild lower back and neck condition but that it was too early to

indicate any permanency. Defendant received and reviewed these reports and other reports from the medical center which delineated Powers–Bowers' treatment there.

Powers–Bowers' next contact with defendant was on September 1, 1978, when he visited defendant at his law office. Powers–Bowers questioned defendant concerning the possibility of an early settlement of the insurance claims and defendant stated that it was too early for a medical determination of permanency of any injuries. In addition, the following discussion occurred:

P: * * * I'm just wondering how long – if you have any idea how long this has to go on. I'm getting kind of tired – ah – playing with [Coifman].

O: Well, it's only been two and a half months since you were involved in a severe accident. You know a case isn't worth anything for sometimes up until two years.

* * * * * *

P: Yeah, but, since, since then, now I've been in the hospital, and they – ah – thought that that'd be a good way to get the bills built up so we'd have a good claim.

* * * * * *

O: Well, you still have neck and lower back problems?

P: Well, you know – I–

O: I get nervous when you do change your tone, I can't get involved in that.

* * * * * *

O: * * * We can try to spend it up, but cases aren't really worth a hell of a lot until they're * * * · have some age, because medical experts will tell you, you can't determine a permanent injury after a few months because one of these days they're going to have their own doctors examine you and they're going to say there's nothing wrong with you.

P: Yeah, but I had – I was in the hospital for 10 days and fooled everybody in the hospital – so –

O: Well, that's good, they'll have good medical reports and good medical, ah ya know – but that's not still showing that you're not going to completely heal and have nothing wrong with you two years from now.

P: Yeah, but–

O: In order to get good money you have to be able to convince the insurance company there's a permanent injury.

P: Oh, I, I'm a good actor, I can convince them of that.

O: You have to convince their doctor of that.

P: I'll convince 'em.

* * * * * *

P: Okay – ahh – how much – ah –trouble could I get in, if the insurance company catches on to this thing?

O: I don't know what trouble you can get in if there's nothing, you know · if –

P: Well–

O: Basically,–

P: The doctor says there's something wrong with me and well – just –

O: Well, if there is something wrong with you – the doctor says there's something wrong with you, and you're bringing this claim against the insurance company, ah – you can't get in any trouble. But if in fact, there isn't anything wrong with you and – ah – I wouldn't be handling this case – I really wouldn't cause that's what I said earlier, I, you know. What prior arrangements you have with Dr. Coifman or Nathan Neff I don't even want to know about it. I know there are certain problems going on down there, cause I've had a few – ah – of the files, I haven't–your the only case I've taken in the last four months out of there. Maybe you're the only patient they've got left, – I don't know, but–ah–

P: Well, may –

O: So let's say – let's put it this way– the only trouble you can get in, is the same trouble Coifman can get in–if this is a phony case, you're both in trouble, you know. But you're in just as much trouble as he's in. Ya, know * * * Ah * * *

P: Well, who's gonna tell 'em though? Who's gonna say that it's a phony case, or if it isn't?

O: There's only one person – you.

P: Well–I ain't going to say – nothin.

O: And Coifman's not going to say anything.

P: No.

O: So then what's the problem?

P: And you ain't going to say nothin' – cause you can't say anything that I tell you, right?

O: It's strictly confidential – just like your priest.

P: Okay, you don't – you don't know nothing about that it's a phony case then – cause

O: No, but if I thought it was phony, I would withdraw from the case, but wouldn't give that as the reason, I would just say * * * ethical conflict.

P: Well, if – I mean – I haven't – I haven't

P: Okay, I haven't told you.

P: At this particular–

O: I have no reason to believe that it's a phony.

P: I haven't, I * * * Okay, I haven't told you anything – as far as that it's not on the up–and–up, or anything as far as you and I are concerned, or anybody else.

* * * * * *

O: * * * I'm sure there's be nothing in the reports – ahhm – well, you know I haven't had this type of problem before in a domestic situation– some lady was here the other day who is working and was getting some welfare, but she had, ah her boyfriend was thrown out of the house.

O: * * * What I'm really getting at here, and I don't know Elizabeth Saunders, I supposed she's a possibili- ty – that you throw her out of the house, or – ah – you break up and start seeing somebody else, and some emotional problems develop–ah–and she'll say–well, you leave me Gene and I'm going to go to–ah to–the medical association, and tell them that you have a phony case. There's a possibility–

P: Well, I don't think so, but that I'm not really worried about.

O: Okay – but other than you and Coif- man, that would be the only other possibility.

P: Well – she – she's involved in it, I mean as far as that goes, just as much as anybody else.

* * * * * *

O: You know then they'll do it, but you know, my – you know – it's just that from the medical treatment stand- point just as long as I do nothing more than read medical reports, and ask you how you feel, I'm you know ··comfortable. It's just that, ah.

P: Well, as far as you and I are con- cerned, I've got back pain, and still a little bit of neck pain and whatever, but – ah – I, I haven't told you anything about anything else.

* * * * * *

O: That's right. Sure – I'd say that by March we could be ready for that kind of settlement without any diffi- culty. You know – with 5,000 clear to you. That would be – ah – you know–without any difficulty at all, because ah–I haven't seen what his recent medical bills * * * there's no medical report, but I've got some imagination.

P: Well, I'm sure, I'm sure, that it's high, cause he's charged me for lots of calls.

O: Well, so –

P: Some of them I didn't even make.

\* \* \* \* \* \*

P: It might – it might be kinda hard to –for the other doctors to say that I got, or to agree with [Coifman] that –or if he says that I've got a 5 or 10% disability–if I ain't hurt, so.

On November 14, 1978, and December 11, 1978, Powers–Bowers called defendant on the telephone. He asked when the case could be settled and was informed by defendant that nothing could be done until defendant received a medical report from Dr. Coifman.

On December 15, 1978, Powers–Bowers went to defendant's office and hand delivered a medical report from Dr. Coifman to defendant. That medical report provided in part:

Mr. Bowers appears to have a character or behavior disorder which makes it difficult for him to get along in close working situations, and his employment, while more or less continuous prior to the accident, has still involved frequent job changes and been most stable when he has been working by himself. I do not feel his prognosis is good for making an adjustment to employment in areas in which he has always had a poor track record, without antecedent or concurrent major counseling and psychiatric intervention of a type for which the patient experiences no motivation to undertake, \* \* \* I thus feel it appropriate to classify Mr. Bowers as 20–25% disabled, because his injury prevents him from returning to gainful employment on a regular basis in the manual labor area in which he has been previously employed, while his own personality structure would be a considerable liability to seeking employment in alternative areas. \* \* \*

The following conversation between Powers–Bowers and defendant ensued:

P: Good. That's what we're waiting for – right there.

O: From Coifman?

P: Yeah. He had me read it to make sure it was right before, he said too that if that's not exactly what you want, that he can redo it too.

\* \* \* \* \* \*

O: I don't like the report, it's the second time I've told Coifman, you know that, you, say 20 to 25 percent disabled, but they have to name the goddam part of the body that disabled. Not disabled because this injury prevents him from returning to gainful employment \* \* \*

\* \* \* \* \* \*

O: I mean, what he's saying is that there's nothing wrong with you. That's what he's saying. Ah, I can try to settle it with this, but it's not worth the kind of money that he could have - if he's said 20 to 25 percent of the back, the neck, legs, arms, ah -- I don't know what the hell's wrong with him. Ya know Neff tells me this is only gonna help you --. this doesn't help you.

P: Yeah?

O: Back and neck sprain. Well,–ah–do you want to have him do a new report? Fine. Or I can just send this one out, and try to get something for it.

O: Nathan – you know the least they could do is come up with a hell of a better report than this. The thing is–you know–he's protecting his ass. It doesn't help if he doesn't say you have a permanent injury, it just says you have 20 to 25 percent disabled, because of the classification of the type of work that you do, that you do manual labor. That doesn't impress State Farm. That doesn't make sense whether you're working or not. He says you have a 20 to 25 percent permanent partial injury of a certain part of your body. That's what would be most beneficial.

P: Well, let's see, why don't we see what the insurance companies will say. Will they make an offer, or will you have to --

O: No, they will give an offer, probably within a week.

P: Why don't you do that, and see what they say — if it's unreasonable—then we'll have Coifman do his bill over again, or his report.

O: He can't do his report over.

P: Well, he can specify as to what he feels is —

O: He'd have to do an amended report.

P: Yeah.

O: Okay, I'll take care of it that way, then.

P: Cause I'd just as soon get it over — if we can get what we want—I'd just as soon not create any more questions about this than we have to.

O: Okay —

P: Cause I don't know how well it could stand up under real close — if you understand what I'm saying.

O: Probably not too well.

After this meeting, defendant sent all medical and hospital reports and all medical bills to the Travelers and State Farm insurance companies. On December 20, 1978, defendant received calls from agents of State Farm and Travelers who both indicated a willingness to settle Bowers' claim. Defendant subsequently negotiated settlements with the agents of State Farm and Travelers. During a discussion with the agent of Travelers, defendant indicated that the Coifman medical bills were too high and that he would try to negotiate Coifman's bill to a lower amount with Coifman's office. Defendant did later confer with Nathan Neff and was able to get Coifman's bill reduced from approximately $3,850 to $1,865.50. However, defendant never informed the insurance companies of this reduction. As a result of the negotiations between defendant and the insurance agents, on December 20, 1978, defendant received $7,315.60 from Travelers Insurance Company and $4,897.60 from State Farm as full settlement for all of Bowers' claims.

On December 21, 1978, Powers-Bowers called defendant and defendant informed him that he could come to defendant's office that afternoon to pick up his check. Powers-Bowers met with defendant later that afternoon. Defendant told him that Dr. Coifman would receive $1,865 out of the settlement and Bowers would receive $6,275. Defendant's fee for the case was $3,037.87. Defendant expressed concern that the Hennepin County Welfare Department had not filed a lien against the settlement since they had paid $1,538 of Bowers' medical bills. Therefore, defendant retained $1,538 out of the settlement in case the welfare department later filed a lien. During this meeting between defendant and Powers-Bowers, the following discussion took place:

O: They don't want to pay anything. They fought all this. I just can't get the kind of money from Travelers that I should have been able to get in your particular case because of Coifman's bad report, okay? That is a bad report. Coifman doesn't know that you're getting seven thousand plus another thirteen and so on and so forth. He doesn't know that.

P: He doesn't know that. Okay.

O: No, absolute not. He thinks you're settling for, ah, forty eight.

\* \* \* \* \* \*

O: I've never been served with a welfare lien. If I had, I couldn't do what I'm doing.

P: Okay.

O: Now that's where Welfare slipped up. They're supposed to send me a welfare lien but the case is only six months old so they probably haven't gotten to it yet. When they get to it, I will then tell them what I collected and once you arrange for an attorney, welfare will pay me one third to collect the money.

P: I see.

O: But they're going to want the other two third back.

P: So okay, that sixteen you might have to pay two thirds of the hospital bill back to Welfare.

O: That's right. \* \* \*

P: If they find out about this.

\* \* \* \* \* \*

P: Okay, I've heard stories now about insurance investigators following people around to find out if they were really hurt. Am I going to have to watch out?

O: Your case is over. Your case.

P: Okay, I don't * * * Okay, it doesn't make any difference if * *

O: Because if you don't * * *

O: The only problem you've got is from welfare or from Coifman. That's the only problem you've got. You say that Coifman * * *

P: Coifman, Coifman ain't gonna argue with this because he knows that * *

O: You told me that he didn't do half the work that he said he did.

P: * * * He knows he didn't, he knows that I wasn't hurt right from the get–go.

O: Okay, I know that, you told me that, and that's why I settled for what you asked me to settle for * * *

O: and there's isn't any two ways about it, that's ah * * *

P: He's not going to argue about that.

O: That, that, I've got certain risks here and my risks are if welfare comes I've got to pay them. That's what I'm holding the money for.

P: Okay.

O: I'm writing the letter the way I'm writing it, ya know, to protect myself. I don't trust Neff.

P: Well, Neff, Neff ain't going to say nothin's either because * * * I walk in the office and tell him that I wasn't hurt in the accident and Coifman asks me how bad do I want to have been hurt.

O: Ya.

P: He ain't gonna argue with this.

O: I don't like to hear you tell me that. I don't even want to know that.

P: All right, I didn't tell you that.

* * * * * *

O: This is from Travelers. And there's ah, yeah, here they are. I can give you a copy of this explanation of payment, seven thousand bodily injury, three hundred thirteen dollars and sixty cents for property damage. I think it's a hell of a fair settlement.

P: I, I, well for someone that wasn't even hurt, that's * * *

* * * * * *

P: Okay, I, I ain't going to have to worry about no insurance man watching me or nothing?

O: No.

P: I don't have to keep pretending I've been hurt or nothing?

O: No, the case is over with.

P: Okay, good.

O: You're settling. The full and final settlement, I mean you don't want, say, somebody to call the insurance company some day and say you never were hurt, you now so, * * *

P: Say, what * * *

O: But if they do, I don't know anything about that.

P: I got a question, what happens if Neff or Coifman get busted some time and they snitch me off.

O: Well, they don't even know you, you're getting any money on this case.

P: Yeah, but they know that, ah, well, they figure that I'm getting something out of it.

O: Well, yeah. They think you're getting a couple thousand dollars.

P: Well, I mean on a phony claim, a thou, a couple thousand dollars, I could go to jail.

O: Well, why should they snitch you off. They're the doctors.

* * * * * *

O: I'm protected on this because I don't know that you weren't hurt.

P: Right.

O: No one's ever told me that.

P: Well, I'm not going to tell you that.

O: I'm just an advocate trying to get you the best kind of, ah, settlement possible * * *

P: Right.

O: And, ah, my only thing is that I just know too damn much about Coifman, and that's why you're the last case I've taken out of that place.

P: Ah * * *

O: I haven't taken any since because you just get me nervous.

P: Well, ah, if I get in any trouble or anything I'll give you a call. And maybe you can help me out there.

O: He's not going to give you any problems.

P: No, I don't mean that, I mean if ever I get in any trouble or some, well, maybe I'll have an accident next year. This is an easy way to make some money.

O: Well, but, they're going to know you have a preexisting claim now.

P: Ya, that's true.

O: Ya, but it's not an easy way * * *

P: You couldn't do that, too often, I don't suppose.

O: No.

P: Aggravate * * *

O: You went in the hospital, ah, the hospital's gonna have records now Coifman's put things there.

P: Yeah.

O: Ah, people have accidents several times a year but, ah, it doesn't work after the first one if it's too often. You shouldn't have another one for five years if you want to make money.

On January 14, 1979, a search warrant was executed at Dr. Coifman's office. On January 15, 16, and 17, defendant tried to reach Powers–Bowers by phone. On January 17, 1979, soon before a search warrant was executed at defendant's office, Powers–Bowers returned defendant's calls and the following discussion took place:

O: * * * [A] client, totally unrelated to you, indicated that, ah, that they were making an investigation of Dr. Coifman and Nathan Neff.

P: They're what?

O: Ah, that the police department's making an investigation of, ah, of Coifman and Neff.

P: What's that going to do to me?

O: Well, nothing, you had a legitimate injury, didn't you?

P: Well, you know about that.

O: Well, you told me it was legitimate. You know, so they're not going to do anything to you. You know, were you faking anything? Cause if you were, you've got a problem. But, ah, you were in the hospital. As a matter of fact, you were treated by another doctor named Engel, weren't you?

P: Ya.

O: And I read Engel's report and Engel found you had a problem so * * *

P: Well, you know what, I, I, told you that, I mean that's * * *

O: Well, what you told me is you had, is you had a problem.

P: I didn't, I didn't tell * * *

O: Ah, and, ah, and, there's a lot of people that see Coifman that they have legitimate problems. I'm sure on occasion there's somebody that sees Coifman that doesn't have a problem. And they're working something out. Hell, when you and your girlfriend were in the office, you indicated well, you know, you didn't know how serious the problem was. And I told you I don't know how many times, that's between you and Coifman. I've never gone to medical school and I'm not a doctor. I think I told you when you were first here, that you know, I don't like doing business with Coifman and as a matter of fact, hadn't for several months. As a matter of fact, you were the very last person that I had anything to do with Coifman. I wouldn't touch a patient from Coif-

man's office for a million dollars. Let's put it this way, for five billion dollars, because, ah, ya know, things just don't look right. But you know, I don't think there's anything to worry about, cause you had a legitimate injury, another doctor examined you, or was there even a third doctor.

\* \* \*

This was Powers–Bowers' last conversation with defendant.

At no time during their relationship did Powers–Bowers tell defendant that no accident had occurred or that the accident report or repair bill were fictitious. Additionally, Powers–Bowers never told defendant, Dr. Coifman, or Dr. Engel that he had a preexisting lower back condition which was not caused by an automobile accident.

The issues presented in this appeal are:

(1) Whether the prosecution engaged in misconduct which denied defendant a fair trial?

(2) Whether the trial court erred in admitting into evidence the tape recordings of communications between defendant and the undercover police officer which were obtained without a warrant but which were consented to by the police officer?

(3) Whether the trial court erred in permitting the jury, while listening to the recorded conversations between defendant and the undercover police officer, to refer to transcripts of those recordings?

(4) Whether there was any inconsistency in the jury verdict for which a new trial is required?

(5) Whether the trial court erred in refusing to dismiss either the two counts of conspiracy or the attempted theft counts?

(6) Whether the trial court improperly instructed the jury on the issue of reasonable doubt?

(7) Whether the trial court erred in accepting a partial jury verdict?

(8) Whether the trial court erred in refusing to dismiss the indictment?

(9) Whether there was sufficient evidence for the jury to find that defendant committed the crimes of attempted theft by swindle?

(10) Whether the trial court erred in dismissing the entrapment defense?

(11) Whether the trial court properly conducted the Schwartz hearing?

1. At trial, the prosecution asked various questions of. Detective Meath and Deputy Powers (Bowers) concerning the police investigation into the possible illegal activities of Dr. Coifman and Coifman's business manager, Nathan Neff. Defendant argues that the prosecution, by asking these questions, sought to repeatedly suggest to the jury that there was some type of "sinister" cooperation between Coifman, Neff, and defendant and to associate defendant with Coifman and Neff's illegal acts. Defendant contends that this questioning was improper and served to prejudice defendant and deny defendant a fair trial since defendant was not being tried for a conspiracy between him and Coifman and/or Neff.[2]

 The questions asked by the prosecution were not improper and the evidence introduced by means of these questions was admissible. The evidence admitted concerning Coifman and Neff served to provide the jury with background information concerning the police investigation into insurance fraud and showed how Deputy Powers came to be associated with defendant. Such background information is relevant evidence and is admissible. Rules 401 and 402, Rules of Evidence; see Advisory Committee Note to Rule 401, Fed.Rules of Evidence. Of course, relevant evidence may be excluded pursuant to Rule 403, Rules of Evidence, if the danger of unfair prejudice substantially outweighs its probative value. However, rulings on evidentiary matters rest within the sound discretion of the trial court. *E.C.I. Corp. v. G.G.C. Co.*, 306 Minn. 433, 437, 237 N.W.2d 627, 630 (1976). The

---

**2.** The indictment against defendant originally alleged a conspiracy between defendant, Powers–Bowers, "and others." The "and others" language was deleted prior to trial. Therefore, the trial did not concern any conspiracy between *defendant and Coifman and/or Neff.*

trial court determined that the background evidence concerning the police investigation of Coifman and Neff was admissible and this determination was not an abuse of the trial court's discretion.

Defendant also claims that questions asked of two defense witnesses by the prosecutor as to whether an attorney has a higher duty than to represent the best interests of his client was clearly prejudicial to defendant. The first reference to a higher duty was made by the prosecuting attorney when he was cross–examining a defense witness who had been qualified as a legal expert in the area of personal injury claims. The question was asked in this context:

Q. * * * You have told us that there is an obligation on an attorney to represent his client's best interests and go forward with his claim in keeping with his obligations to the client and to the code of ethics, is that a fair summary?

A. I think so, true.

Q. Is there a higher duty than that which would run to a client who walks in off the street and asks you to do something for him?

Mr. Collins: I'm going to object to this, Your Honor, on the grounds it's immaterial, irrelevant. Also, improper.

The Court: I will sustain on the first ground.

A similar question was asked during the prosecution's cross–examination of defendant as follows:

Q. You mentioned an ethical duty to represent your client's best interests, I believe?

A. Yes, sir.

Q. Do you have a higher duty than to represent a client's interests?

Mr. Collins: I'm going to object to that, Your Honor, on the grounds it's immaterial and irrelevant. May we approach the bench?

The Court: Yes.

* * * * * *

The Court: I will sustain an objection to the question.

Defendant argues that through these questions the prosecution sought to suggest that defendant, because of his status as a lawyer, has a higher duty to obey the law than does an ordinary citizen. However, these questions appear only to have been asked in order to establish that an attorney's duty to obey the law outweighs any ethical duty to zealously pursue his clients' claims and did not suggest that a lawyer has a greater duty to obey the law than others. As such, these questions were not improper nor did they serve to deny defendant a fair trial especially since the trial court sustained objections to these questions.

Prior to trial, Detective Meath interviewed Dr. Engel, the doctor who had examined Powers–Bowers during his hospitalization, and made a report of that interview. Defendant claims that the state failed to produce the report of the interview with Dr. Engel and that such failure violated Rule 9.01, Rules of Criminal Procedure, and defendant's due process rights. Even assuming that the failure to turn over this information was improper, it is clear that defendant was not prejudiced thereby. Defendant had Detective Meath's report in his possession at trial and, in fact, submitted this report into evidence. Furthermore, Rule 9.01, subd. 1(a), Rules of Criminal Procedure, was not violated because Dr. Engel appeared as a witness for the defense at trial. The state did not call him as a witness.

2. Defendant asks this court to hold that the use at trial of oral and wire communications, intercepted by means of electronic monitoring and recording devices with the consent of one of the parties to the communications, violated defendant's constitutional right against unreasonable searches and seizures since no warrant was obtained for the interceptions.

We recently addressed this issue in *State v. Bellfield*, 275 N.W.2d 577, 578 (Minn. 1978), and held:

Because one of the parties to these conversations–i. e., the informer–voluntarily

consented to the taping of these calls, no warrant was required by either the Federal or state statutes relating to interception and recording of telephone communications, and no Fourth Amendment issue is presented.

*See also United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); Minn.Stat. § 626A.02, subd. 2(c) (1978). Our *Bellfield* ruling is dispositive of the issue presented and we, therefore, reject defendant's argument.

■ 3. At trial, the jury was allowed to refer to transcripts of tape recorded conversations between defendant and Power–Bowers while the jury listened to the actual tape recordings of those conversations. Defendant argues that the trial court committed reversible error by allowing such use of these transcripts.

In *United States v. McMillan*, 508 F.2d 101 (8th Cir. 1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975), the Eighth Circuit set forth guidelines for the use of transcripts of tape recordings at trial as follows:

> If accuracy remains an issue, a foundation may first be laid by having the person who prepared the transcripts testify that he has listened to the recordings and accurately transcribed their contents. (Citations omitted.) Because the need for transcripts is generally caused by two circumstances, inaudibility of portions of the tape under the circumstances in which it will be replayed or the need to identify the speakers, (citations omitted) it may be appropriate, in the sound discretion of the trial judge, to furnish the jurors with copies of a transcript to assist them in listening to the tapes. In the ordinary case this will not be prejudicially cumulative. (Citations omitted.) Transcripts should not ordinarily be read to the jury or given independent weight. The trial judge should carefully instruct the jury that differences in meaning may be caused by such factors as the inflection in a speaker's voice or inaccuracies in the transcript and that they should, therefore, rely on what they hear rather

than on what they read when there is a difference. Transcripts should not ordinarily be admitted into evidence unless both sides stipulate to their accuracy and agree to their use as evidence. (Citation omitted.)

508 F.2d at 105–106. These guidelines appropriately recognize the need for the use of transcripts in certain instances and at the same time serve to protect against any undue emphasis which might be given to such transcripts.

In this case, the accuracy of the transcripts was in issue. Therefore, Deputy Powers, the preparer of the transcripts, laid a proper foundation for their use. He testified that he prepared the transcripts after listening to the tapes several times and that the transcripts accurately reflected the conversations between defendant and him. Additionally, the tapes were not clearly audible in part and the transcripts served to identify the speakers. Therefore, the trial court did not abuse its discretion in determining to allow the use of the transcripts. Furthermore, the trial court carefully admonished the jurors to rely on what they heard rather than on what they read:

> [THE COURT]: All right, we will proceed with the recordings. Jurors, you will each be provided with what is purported to be a transcript of the taped conversation. The parties do not agree that the transcripts are exact transcripts, nor do they agree as to what was said or what was heard from a portion of the tapes in some instances. The differences in understanding of meaning or meaning what was said may be caused by such factors as the inflection of a voice or inaccuracies of the transcript and you should rely upon what you hear rather than what you read if you find a difference between the tape and the transcripts. The transcripts are provided to you to assist you in listening to the tapes and will be collected from you at the conclusion of the playing of each tape. The transcripts will not be available to you during your deliberations to reach a verdict.

Sometimes on the tapes it appears that two or more persons talk at the same time. It is for the jurors to determine from the tape which party talked first. The transcript is not to control. The tape is to control.

A transcript of each tape was distributed to the jury just prior to the playing of that tape and was immediately picked up after that tape was played. The transcripts were not placed in evidence; only the tapes were. Thus, the *McMillan* guidelines were carefully followed and no error occurred.

4. Defendant was charged with two counts of conspiracy and two counts of attempted theft. The jury returned a verdict of guilty on the attempted theft counts but was unable to reach a verdict on the conspiracy counts. Defendant argues that this constitutes an "inconsistent" jury verdict.

We do not agree with defendant's argument that the failure to reach a verdict on certain counts may serve to render a verdict inconsistent. Furthermore, even assuming *arguendo* that there is any inconsistency in the verdict returned by the jury, reversal is not required as defendant suggests. This court has adopted the majority rule with respect to inconsistent jury verdict as follows:

> The general rule is that a defendant who is found guilty of one count of a two count indictment or complaint is not entitled to a new trial or a dismissal simply because the jury found him not guilty of the other count, even if the guilty and not guilty verdicts may be said to be logically inconsistent.

*State v. Juelfs*, 270 N.W.2d 873, 874 (Minn. 1978). Therefore we find defendant's argument to be meritless.

5. Defendant argues that the indictment charging him with two counts of attempted theft and two counts of conspiracy was multiplicious. Defendant makes this argument by contending that attempted theft and conspiracy were essentially identical crimes in this case. Defendant claims, therefore, that the trial court erroneously refused to dismiss either the attempted theft counts or the conspiracy counts of the indictment.

The essential elements of the crime of attempt are: (1) an intent to commit a crime, and (2) a substantial step taken toward the crime's commission. *See* Minnesota Practice Crim.Jury Instruction Guides 5.01 (1977). The elements of the crime of conspiracy are: (1) an agreement with another to commit a crime, and (2) an overt act in furtherance of the conspiracy. *See* Minnesota Practice Crim.Jury Instruction Guides 5.07 (1977). Thus, the crimes of conspiracy and attempt each require distinct elements of proof and are entirely separate crimes. *State v. St. Christopher*, 305 Minn. 226, 235–36, 232 N.W.2d 798, 803–04 (1975); *Cf. United States v. Brodbeck*, 430 F.Supp. 1056 (D.C.Wis.1977). It was, therefore, proper to charge defendant with both the crimes of conspiracy and attempted theft in the indictment.

6. The trial court, in its instructions to the jury, defined proof beyond a reasonable doubt as follows:

> A reasonable doubt is doubt based upon reason and common sense and arising from the state of the evidence. It is rarely possible to prove anything to an absolute certainty. Proof beyond a reasonable doubt is established if the evidence is such as you would be willing to rely on and act upon in the most important of your own affairs.

Defendant argues that this instruction is erroneous because it defines reasonable doubt in terms of a "willingness to act." Defendant contended at trial that reasonable doubt should be defined in terms of a willingness to act *without hesitation.*

The proposed instruction on reasonable doubt in Minnesota Practice Crim.Jury Instruction Guide 3.03 contains, in pertinent part, language which is identical to that used by the trial court in this case. The comment to that proposed instruction rejects the use of the term "without hesitation" on the ground that it suggests a recklessness which is antithetical to the rational process to be pursued by a jury. We agree.

■ Defendant also contends that the trial court's instruction was erroneous because it did not convey to the jury that they would have no reasonable doubt if they were "morally certain" of their decision. In *State v. Boykin*, 312 Minn. 593, 252 N.W.2d 604 (1977), we upheld the trial court's decision not to give a "moral certainty" instruction. In doing so, we cited *United States v. Lawson*, 507 F.2d 433 (7th Cir. 1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975), and quoted with approval the following language from that case:

> Because of the very commonness of the words, the straining for making the clear more clear has the trap of producing complexity and consequent confusion. That this difficulty may be surrounded is evidenced by the attempts which have been approved, although the language of approval has frequently implicitly suggested the difficulties of articulation. That the difficulties may be surmounted, however, does not mean in our opinion that the effort has to be made.
>
> The essential aspect of the matter it appears to us is that the jury clearly understood that there must be proof persuasive beyond a reasonable doubt. Defining the term should be at the option of the trial judge even though a defining instruction is tendered. Lack of definition would not appear to be prejudicial. 507 F.2d at 442.

312 Minn. at 594, 252 N.W.2d at 606. We find that the instruction given in this case adequately conveyed the concept of proof beyond a reasonable doubt to the jury.

■ 7. Defendant claims that the trial court committed reversible error by accepting a partial jury verdict. Since each count of an indictment is to be treated as a separate indictment, *People v. Pierce*, 40 App.Div.2d 581, 334 N.Y.S.2d 410 (1972), we find that it was not improper to acccpt a verdict on only some of the counts charged when the jury was unable to reach a verdict on all counts. *See Selvester v. United States*, 170 U.S. 262, 265, 18 S.Ct. 580, 581, 42 L.Ed. 1020 (1898); *Tyler v. United States*, 397 F.2d 565, 570 (5th Cir. 1968),

*cert. denied*, 394 U.S. 917, 89 S.Ct. 1187, 22 L.Ed.2d 450 (1969).

8. Defendant argues that prosecutorial misconduct occurred during the grand jury proceedings which so tainted those proceedings that the indictment should have been dismissed.

Defendant first contends that the prosecution improperly elicited testimony from Detective Meath concerning the investigation of Dr. Coifman and Nathan Neff and improperly allowed the grand jury to use transcripts of the taped conversations between defendant and Powers–Bowers. These contentions have been dealt with and rejected above.

■ Defendant also argues that the prosecution improperly failed to provide a verbatim record of all statements made by the prosecution to the grand jury. Rule 18.05, subd. 1, Rules of Criminal Procedure, does not require that all statements made by the prosecution be recorded. It only requires that a record be made of all statements of grand jury witnesses as follows:

> A verbatim record shall be made by a reporter or recording instrument of the evidence taken before the grand jury and of all statements made and events occurring while the witness is before the grand jury.

This requirement was complied with in this case.

■ In addition, defendant suggests that pre–grand publicity concerning this case served to unfairly prejudice the grand jury's determination. However, defendant does not explain how this publicity affected the proceedings, nor does he present any evidence showing that the publicity had any effect on the grand jury. Therefore, we must reject defendant's argument as merely speculative.

Lastly, defendant argues that the prosecution engaged in misconduct during the grand jury proceedings by failing to present evidence to the grand jury concerning the medical examination of Powers–Bowers by Dr. Engel. Defendant claims that the failure to produce this evidence was improper

because it constituted exculpatory evidence. The report of Dr. Engel's examination of Powers–Bowers indicated that Powers–Bowers had a valid lower back injury and defendant reviewed this report. Defendant claims that he justifiably relied on this report in determining that Powers–Bowers had a valid claim against the insurance companies and that, therefore, the medical report was exculpatory.

■■■■■ Defendant's characterization of this evidence must be reviewed not in a vacuum but in context with the other evidence presented to the grand jury. The failure to produce this evidence will not require reversal unless it would have materially affected the proceedings. *See generally Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The evidence presented to the grand jury showed that although certain medical reports indicated that Powers–Bowers had a valid injury, defendant was repeatedly told by Powers–Bowers that he was not injured and that Powers–Bowers had successfully feigned injury while in the hospital. Thus, the Engel medical report cannot be said to be evidence which would have materially affected the grand jury determination. Therefore, the trial court did not err in refusing to dismiss the indictment.

9. Defendant contends that there was insufficient evidence presented at trial to sustain a verdict of guilty of the crimes of attempted theft by swindle. In determining the sufficiency of the evidence in a criminal matter, this court "must view the evidence in a light most favorable to the jury verdict and decide whether the jury could reasonably have found the defendant guilty of the crime charged." *State v. Swain*, 269 N.W.2d 707, 712 (Minn.1978).

■■■■■ The only disputed issue before the jury in this case concerned the intent element of the crime of attempted theft by swindle. The essence of a swindle is the defrauding of another of his property by deliberate artifice. *State v. Ruffin*, 280 Minn. 126, 129–30, 158 N.W.2d 202, 205 (1968); *State v. Wells*, 265 Minn. 212, 214, 121 N.W.2d 68, 69 (1963). The offense cov-

ers a broad range of fraudulent conduct and, thus, the various elements of the offense are incapable of precise definition. 280 Minn. at 130, 158 N.W.2d at 205. However, in the context of insurance fraud, it is our conclusion that the intent element may be satisfied through proof that the defendant knew of the falsity of a claim which he presented to an insurance company or presented a claim which he knew to be unjustified by the information in his possession.

■■■ We find that there was clearly sufficient evidence to support the guilty verdict in this case. The evidence supporting the conviction is outlined above. This evidence indicates that defendant presented Powers–Bowers' claim to two insurance companies even though Powers–Bowers had told defendant that he was not injured.

At trial, defendant took the stand and testified that he never understood that Bowers was faking his injuries. He testified that during their relationship, Bowers acted weird, that he reminded defendant of a "Glenwood Hills patient", that Bowers posed "strange hypotheticals" to him, and that he had to humor Bowers. Defendant testified that although Bowers told him at times that he was not hurt, defendant relied on the accident reports, medical reports, and Bowers' explanation of the accident and his injuries to determine that Bowers had a valid claim. Defendant's wife, Nancy Olkon, also testified on behalf of defendant. She stated that defendant had difficulty listening to and comprehending the statements of other persons. She also testified that defendant, at times, displayed a bizarre sense of humor and sometimes made inappropriate jokes. A number of other witnesses all testified to defendant's good reputation for truth and honesty in the community.

Defendant's claimed reliance on medical reports in concluding that Powers–Bowers had a valid injury must be viewed in light of the contrary evidence that Powers–Bowers had informed defendant that Dr. Coifman knew that he was not injured and that

Powers–Bowers had been able to "fool" everyone at the hospital with respect to his injuries. The jury was at liberty to disbelieve defendant's evidence and could conclude from all the evidence either that defendant knew that he was presenting a false claim or that defendant knew the claim to be unjustified based on the information given to him by Powers–Bowers.

 Defendant also argues that, in settling his client's claims, he was only discharging his ethical duty as a lawyer to represent his client zealously. Defendant also contends that he had a special duty in this regard because Bowers was a "street person" who displayed "psychotic" tendencies. The short answer to this contention is that although an attorney does have the duty to represent his client zealously, he must do so *within the bounds of the law.* *See* Canon 7, Code of Professional Responsibility.

10. Defendant argues that the trial court erred in dismissing the entrapment defense raised by defendant. The trial court determined that the state merely provided defendant with the opportunity to commit the crime and that, therefore, no entrapment occurred.

The leading case in Minnesota on the defense of entrapment is *State v. Grilli,* 304 Minn. 80, 230 N.W.2d 445 (1975). In that case, we stated:

> In order to decide whether defendant was entrapped, focus must be placed on the necessary elements of the defense. The long–established, presently prevailing majority rule associated with the majority opinions in the three United States Supreme Court cases, *Sorrells* [*v. U. S.,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413], *Sherman* [*v. U. S.,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848], and *Russell,* has been termed the "subjective" test. *United States v. Russell,* 411 U.S. 423, 440, 93 S.Ct. 1637, 1647, 36 L.Ed.2d 366, 378 (Mr. Justice Stewart dissenting). In the majority view, the inquiry on entrapment is concerned primarily with the element of defendant's predisposition: whether it was his own original intent to commit the crime charged. The defense must show that the actions of the police went further than those necessary to produce evidence of the defendant's criminality.

> \* \* \* \* \* \*

> In disposition of the case before us, we maintain our support of the majority view as expressed in *Sorrells, Sherman,* and most recently in *Russell,* that "predisposition" as well as "inducement" should be considered when the entrapment issue arises before (or during) trial. We therefore adhere to the "subjective" approach in so far as it retains "predisposition" as an ingredient of entrapment cases.

304 Minn. at 89, 91–92, 230 N.W.2d at 452, 453 (footnote omitted).

 With respect to proof of the element of inducement, the majority view is that the evidence must show that the state did something more than merely solicit the commission of a crime. *See United States v. Burkley,* 591 F.2d 903 (D.C.Cir.1978), *cert. denied,* 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979); *United States v. DeVore,* 423 F.2d 1069 (4th Cir. 1970), *cert. denied,* 402 U.S. 950, 91 S.Ct. 1604, 29 L.Ed.2d 119 (1971); *United States v. Costello,* 483 F.2d 1366 (5th Cir. 1973); *United States v. Christopher,* 488 F.2d 849 (9th Cir. 1973). *But see United States v. Licursi,* 525 F.2d 1164 (2d Cir. 1975), *United States v. Armocida,* 515 F.2d 49 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). Although we have not heretofore directly addressed this question, we find that something in the nature of persuasion, badgering, or pressure by the state must occur before the inducement element is satisfied.

In addressing the element of predisposition, we have stated:

> [W]here the state can show the defendant's "predisposition" by evidence of (a) defendant's active solicitation to commit the crime, (b) prior criminal convictions, or (c) prior criminal activity not resulting in conviction (as here), or (d) defendant's criminal reputation, or by any other ade-

quate means the challenged conduct of the state's officers is mitigated or excused, and the defense of entrapment is not proved.

304 Minn. at 89, 230 N.W.2d at 452. In this case, there was no evidence that defendant actively solicited the commission of the offense, had prior criminal conviction, had engaged in prior criminal activity, or had a prior criminal reputation. Therefore, we must determine whether defendant's predisposition was shown by *other adequate means*. In a number of cases, courts have found that predisposition may be proved by evidence that the accused readily responded to the solicitation of the commission of a crime by the state. *See United States v. Spain*, 536 F.2d 170 (7th Cir.), cert. denied, 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976); *United States v. Prieto–Olivas*, 419 F.2d 149 (5th Cir. 1969); *United States v. Ortiz*, 496 F.2d 705 (2d Cir. 1974). *See generally Masciale v. United States*, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859 (1958); *State v. Poague*, 245 Minn. 438, 72 N.W.2d 620 (1955). We acquiesce in this view.

We conclude that the evidence is sufficient to show that defendant was not induced into the commission of any offense and that defendant readily responded to the solicitation by Powers–Bowers. The evidence indicates that Powers–Bowers went to defendant and indicated to him that he wanted to file an insurance claim even though he was not injured. The evidence also indicates that defendant readily agreed to represent Bowers. Furthermore, the evidence shows that Bowers did not exert pressure on defendant. In fact, Bowers clearly told defendant that defendant could withdraw from representation if he wished to as follows:

P: Because, ah–as a matter of fact I would say that if–if you're worried about me, maybe you should–*maybe I should go find some other attorney*–if–ah–I mean this is here again like I, I'm not going to say anything–they're sure not gonna.

\* \* \* \* \* \*

P: Sure. And after you check that over, *and decide you don't want me*

*around*, just let me know. [Emphasis added.]

Therefore, we conclude that the trial court did not err in dismissing the entrapment defense.

11. Subsequent to trial, Mr. Tom Matthews, a television investigator, sent a letter to Judge Amdahl which stated that he had heard from at least two sources that anti–Semitic remarks may have occurred during the jury deliberations. The letter also indicated that one of the jurors may have been predisposed to find defendant guilty before the jury deliberations began. Judge Amdahl also received two affidavits from a Mr. Cox, the father of a juror, and a Mr. Hunter. The Cox affidavit indicated that "anti–Semitism" may have occurred during the deliberations. The Hunter affidavit indicated that a juror may have had, during the trial, an improper discussion with the juror's employer about the trial. On the basis of this information, the trial court granted defendant's motion for a "Schwartz" hearing pursuant to Rule 26.03, subd. 19(6), Rules of Criminal Procedure.

The trial court determined to call six of the jurors to testify at the hearing for the following reasons:

The Court requested six of the twelve jurors to appear for questioning concerning alleged statements indicating religious bias. Two of the six were jurors named in the document filed with the Court (a letter from Mr. Matthews–a TV investigator–and an affidavit of the father of one of the jurors) reciting alleged anti–Semitic conduct. A third juror was one who was named in an affidavit filed concerning a lunch–time contact with his employer, and, because his presence was needed to question him on that event, was also to be one of the jurors to be questioned about the anti–Semitic allegation. A fourth was one of the oldest jurors who was selected by the Court because Mr. Matthews' letter referred to "an older man" as a source of a statement indicating bias. The fifth juror was the foreperson of the jury, and the sixth was chosen at random from the remain-

ing jurors to bring to 50% the jury representation at the hearing.

At the hearing, all of the six jurors called testified that they had not heard any anti–Semitic remarks during the deliberations. The juror who had had the contact with his employer testified that the contact had not influenced his decision–making. Therefore, the court denied defendant's motion for a new trial because of juror misconduct.

■■■■■■ Defendant argues that the trial court conducted the Schwartz hearing improperly. He first contends that the trial court should have called all 12 jurors to testify instead of six. While there are no cases which have addressed this issue, we find that the manner in which a Schwartz hearing is conducted rests within the sound discretion of the trial court. In this case, the trial court did not abuse its discretion in determining to call six jurors, four of whom were referred to in the allegations of misconduct. This is especially true in light of the fact that no juror misconduct was revealed by the testimony of the six jurors.

Defendant also contends that the trial court improperly limited the scope of inquiry at the Schwartz hearing. Prior to the hearing, defense counsel requested that he be allowed to inquire into the possible predisposition of an older juror to convict from the beginning of the deliberations. The court denied this request.

■■■■■■ The trial court properly determined not to allow questioning concerning the predisposition of any jurors. Rule 606(b), Rules of Evidence, provides:

Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial informa-

tion was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

Thus, under the rule, the thought processes of a juror are protected from later inquiry. See 1977 Committee Comment to Rule 606. Any inquiry into the predisposition of a juror would constitute improper scrutiny of the state of mind or the thought process of the juror in contravention of Rule 606(b).

We have considered all other arguments raised by defendant and have determined that they are without merit. The judgment is, therefore, affirmed.

Affirmed.

AMDAHL, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

YETKA, Justice (dissenting).

I dissent. The role of this court, the court of last resort for most parties, is to see that justice is done in the courts of this state. When we are of the firm conviction that a mistake has been made or that an injustice has been done to a party, it is our duty to correct the wrong. While I do not think the trial court erred based upon our prior decisions, there are a number of troubling factors in this case which, in my view, warrant reversing the conviction.

The facts of this case are unlike any other case this court has seen. The police were not after Ellis Olkon; they were after Dr. Robert Coifman, who was suspected of issuing fraudulent medical reports. The police had no information nor any suspicion that Olkon was involved in any fraud schemes. They decided to "test" Olkon only after Dr. Coifman referred policeman Walter Powers to Olkon. Thus, the police had no rational justification for setting a trap for Olkon.

Olkon received both a police report indicating that an automobile accident had occurred and medical reports indicating that Powers was injured. Some of the medical reports were from Dr. Coifman, whom, as the majority indicates, Olkon may have had reason to doubt. However, Olkon also received a report verifying the injury from Dr. Engel, a physician totally independent of Dr. Coifman and beyond any suspicion.

Of course, Powers told Olkon he had fooled the doctors. Olkon had good reason to disbelieve this assertion due to the medical reports themselves, Powers' highly unusual behavior, and a medical report indicating that Powers had a character of personality disorder. It is also relevant here that Powers never denied that the accident had occurred. Olkon believed Powers was a "macho" type trying to downplay his injuries.

Moreover, Powers had not really fooled the doctors at all. Powers had previously suffered a real back injury. He disclosed this fact neither to his doctors nor Olkon. Thus, in reality, Powers had not fooled the doctors; the doctors' reports were correct and Olkon was justified in relying on them. With these facts in mind, we can turn to the troubling issues presented.

Olkon urges that the indictment should have been dismissed because the prosecutor failed to disclose to the grand jury known exculpatory evidence: Dr. Engel's report verifying the injury and the fact that Powers did in fact have a real back injury. Since the duty of a grand jury "is to clear the innocent, no less than to bring to trial those who may be guilty," *United States v. Dionisio*, 410 U.S. 1, 16–17, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1975), several courts have held that a prosecutor has a duty to disclose known exculpatory evidence to the grand jury.[1] The ABA Standards for Criminal Justice, *The Prosecution Function* § 3 6(b) (Approved Draft 1971) states, "The prosecutor should disclose to the grand jury any

evidence which he knows will tend to negate guilt." We previously urged prosecutors to follow this standard. *See State v. Florence*, 306 Minn. 442, 457 n. 19, 239 N.W.2d 892, 902 (1976).

Applying these standards to this case, I would hold that the indictment should have been dismissed. It is specious to argue that these items of evidence were not significant; they were crucial indicators that Olkon had good reason to file the insurance claim based upon the medical reports he had received.

For many of the same reasons, I believe the evidence in general was not sufficient to support the verdict of guilty of the crime of attempted theft by swindle. As the majority notes, the key issue is whether the prosecution proved beyond a reasonable doubt that Olkon knew the insurance claim was false. First, however, it must be decided whether the claim was totally false. The insurance claim made essentially two assertions: (a) that Powers had a back injury; and (b) that the injury was caused by the accident in question. As noted previously, assertion (a) was *true* because Powers did in fact have a back injury which was properly diagnosed by the doctors. Assertion (b) was false because the back injury was pre-existing. However, Powers never disclosed this to Olkon or to the doctors. Thus, there is no way Olkon can be charged with knowledge of the falsity of assertion (b) so the intent element is simply nonexistent.

Even disregarding the pre-existing back injury, Olkon cannot be charged with intent to file a false claim. As noted in the facts above, Olkon was justified in relying on the two independent medical reports. Although Powers tried to downplay his injuries, Olkon knew Powers had psychological problems and felt that he was trying to prove his toughness. Olkon was never given reason to doubt that the accident had occurred. Thus, even if the actual exist-

1. *See, e.g., Frink v. State*, 577 P.2d 154 (Alaska 1979); *Johnson v. Superior Court*, 15 Cal.3d 248, 539 P.2d 792, 124 Cal.Rptr. 32 (1975); *State v. Hall*, 235 N.W.2d 702 (Iowa 1975); *State v. Herrera*, 93 N.M. 442, 601 P.2d 75 (Ct.App.), *cert. denied*, 93 N.M. 683, 604 P.2d 821 (1979).

ence of the back injury is ignored, Olkon was justified in believing the claim to be proper.

As Powers' attorney, Olkon had a duty to represent him "zealously within the bounds of the law." *Minn.Code of Professional Responsibility*, Canon 7. The code also provides:

EC 7-3. * * * In asserting a position on behalf of his client, an advocate for the most part deals with past conduct and must take the facts as he finds them. * * *

* * * * * *

EC 7-19. * * * An adversary presentation counters the natural human tendency to judge too swiftly in terms of the familiar that which is not yet fully known; the advocate, by his zealous preparation and presentation of facts and law, enables the tribunal to come to the hearing with an open and neutral mind and to render impartial judgments. The duty of a lawyer to his client and his duty to the legal system are the same: to represent his client zealously within the bounds of the law.

* * * * * *

EC 7-26. The law and Disciplinary Rules prohibit the use of fraudulent, false, or perjured testimony or evidence. A lawyer who knowingly participates in introduction of such testimony or evidence is subject to discipline. A lawyer should, however, present any admissible evidence his client desires to have presented unless he knows, or from facts within his knowledge should know, that such testimony or evidence is false, fraudulent, or perjured.

Unless a lawyer knows that the client's factual statements are false, his duty is to advocate the client's position zealously. The attorney is not required to make an independent investigation of his client's veracity in an effort to impeach him; that is the duty of the other parties in an adversary system. The insurance companies could have investigated the case and had further medical examinations taken. Unfortunately, the protections of the adversary system were wholly lacking since the insurance companies were in collusion with the police. The insurers never questioned the early medical reports and never indicated any doubt as to the claim.

I do not believe that the defendant would ever have been prosecuted were he not a lawyer. The evidence of guilt is simply too flimsy and ambiguous. I believe the prosecution felt compelled to prosecute him out of fear of possible public censure that it was deliberately being easy on a member of the legal profession.

Under the facts of this case, I would hold that Olkon was justified in filing the claim and that intent to file a false claim on his part was not proven beyond a reasonable doubt.

I also believe the defendant was entrapped and that this is a total defense to the charges brought. In *State v. Grilli*, 304 Minn. 80, 230 N.W.2d 445 (1975), this court adopted the "subjective" test for entrapment. While I believe *Grilli* should now be overruled and the "objective" test adopted, I also believe the facts show that Olkon was entrapped even under the subjective test.

The subjective test of *Grilli* focuses on the particular defendant involved, the key question being whether the defendant was predisposed to commit the crime. There is no evidence whatsoever that Olkon was predisposed to commit this crime. The *Grilli* case stated four specific ways of proving predisposition, but not one of them is true here. The majority states that predisposition can be proven by the willingness of the person to participate in this crime. Neither *Grilli* nor *State v. Poague*, 245 Minn. 438, 72 N.W.2d 620 (1955) supports that principle,[2] and we should not adopt it now.

---

2. In *State v. Poague*, 245 Minn. 438, 72 N.W.2d 620 (1955), the woman charged with being a prostitute ran a "dating service" which could have been a front for a prostitution service and the police were acting on a complaint received.

In *State v. Grilli*, 304 Minn. 80, 230 N.W.2d 445 (1975), the defendant approached the undercover agent with regard to selling him drugs and there was also evidence of prior possession of illegal drugs.

The subjective test has also been referred to as the "origin of intent" test. *See State v. Grilli*, 304 Minn. at 88, 230 N.W.2d at 451. In this case, there is no question but that the whole scheme was contrived by the police in order to trap Coifman. In *Grilli*, we quoted with approval the following from *Newman v. United States*, 299 F. 128, 131 (4th Cir. 1924):

> When the criminal design originates, not with the accused, but is conceived in the mind of the government officers, and the accused is by persuasion, deceitful representation, or inducement lured into the commission of a criminal act, the government is estopped by sound public policy from prosecution therefor.

Since the criminal design here originated with the police and Olkon was lured by numerous deceitful acts into filing the insurance claim, he has a valid entrapment defense even under the subjective test.

In a case with strikingly similar facts, the Illinois Supreme Court held that the attorney had been entrapped under the "subjective" test. *In re Horwitz*, 360 Ill. 313, 196 N.E. 208 (1935). In that case, as here, the detective had created a fictitious accident but never told the attorney it had not occurred. The detective also had a pre–existing back injury but never disclosed it. The medical reports verified the injury but the detective, when concealed witnesses were listening, made statements such as "You know I am not injured." The Illinois court concluded:

> If this entire record is interpreted most strongly against the respondent, it falls short of sufficient ground for disbarment. He was entrapped by a set of false and carefully arranged circumstances and evidence sufficiently valid, and apparently real, to deceive an experienced practitioner.

360 Ill. 313, 196 N.E. at 213. Although that case was a disciplinary case, it is even less proper to convict such an attorney of a crime because of the higher standard of proof and the necessity of proving intent. I would apply *Horwitz* and hold that Olkon was entrapped under the *Grilli* test.

I also believe we should now overrule *Grilli* and adopt the objective test. The objective test, as formulated in the American Law Institute, *Model Penal Code* § 2.13(1) (Proposed Official Draft 1962), provides:

> A public law enforcement official or a person acting in cooperation with such an official perpetrates an entrapment if for the purpose of obtaining evidence of the commission of an offense, he induces or encourages another person to engage in conduct constituting such offense by * * *:
>
> \* \* \* \* \* \*
>
> (b) employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it.

This test deals squarely with the problem of this case: the fact that many attorneys, not out to commit fraud but to serve their clients diligently, would file a claim if presented with the tactics used and facts of this case. If that is so, then the police have not proven that Olkon is more guilty than other innocent persons. This court should not stand by and allow police to use tactics which do not separate the guilty from the innocent.

The objective test is supported by many of the United States Supreme Court justices in their various concurring and dissenting opinions.[3] The states are clearly free to adopt a stricter test than the federal rule, and many states have done so. In addition to the five state courts which had

---

**3.** *See Sorrels v. United States*, 287 U.S. 435, 453, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932) (Roberts, Brandeis & Stone, JJ., concurring); *Sherman v. United States*, 356 U.S. 369, 378, 78 S.Ct. 819, 823, 2 L.Ed.2d 848 (1958) (Frankfurter, Douglas, Harlan & Brennan, JJ., concurring); *United States v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973) (Douglas & Brennan, JJ., dissenting); *id.* at 439, 93 S.Ct. at 1646 (Stewart, Brennan & Marshall, JJ., dissenting). *Hampton v. United States*, 425 U.S. 484, 496, 96 S.Ct. 1646, 1653, 48 L.Ed.2d 113 (1976) (Brennan, Stewart & Marshall, JJ., dissenting).

adopted the objective test noted in *Grilli*,[4] another eleven states have now adopted the objective test by statute.[5] The objective test is also supported by the overwhelming majority of scholarly writing on the subject.[6]

I propose that we now adopt this test. Since the tactics used by the police under the facts of this case created a substantial risk that innocent persons would have been trapped, I would hold that the defendant has made out the defense in this case.

One of the vices of entrapment is that the police must themselves break the law to catch supposed criminals. The illegalities in this case include issuing a false driver's license, issuing a false welfare card, writing a phony accident report, issuing a phony receipt for a copy of the report, and writing a false auto repair bill. We know from *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), that even the President of the United States is not above the law. Where is the authority in the Constitutions of the United States or the State of Minnesota or by statute which permits the police in this state to break the law in order to enforce the law? There is the ancient common law rule of fresh pursuit of a lawbreaker, but that is inapplicable to this case. We are not a police state *yet.*

Entrapment is not even a necessary technique as to this kind of crime. Doctors, lawyers, and insurance companies all keep thorough records on cases. If the police had reason to suspect Coifman or Olkon, they could have used their investigatory skills and powers to find and solve any crimes which had been committed rather than creating new crimes and committing crimes themselves in the process.

The Illinois Supreme Court in *Horwitz* stated:

> For the lawyer in active practice real temptations are plentiful and sufficient without their artificial multiplication by private parties whose real motives can with certainty be known only to themselves. The lawyer must deal with exaggerations, fraud, and actual perjury day after day, and occasionally these things come from his own clients without his knowledge or consent. His path is hazardous at best, and if he can so far avoid its natural pitfalls as to maintain and be able to prove a good reputation, it should be sufficient to protect him against plots and schemes.

360 Ill. 313, 196 N.E. at 214. Therefore, even if the federal courts would allow this form of entrapment under the United States Constitution, I would hold the procedure herein used as violative of our Minnesota Constitution.

Finally, there was evidence submitted to the trial judge that antiSemitic remarks were made during jury deliberations. Rule 26.03, subd. 19(6), of the Rules of Criminal Procedure states that if there is a question about extraneous matters affecting the verdict, "the jurors shall be interrogated." This court has never said whether this rule

---

4. *Grossman v. State*, 457 P.2d 226 (Alaska 1969); *People v. Barraza*, 23 Cal.3d 675, 591 P.2d 947, 153 Cal.Rptr. 459 (1979); *State v. Mullen*, 216 N.W.2d 375 (Iowa 1974); *People v. Turner*, 390 Mich. 7, 210 N.W.2d 336 (1973); *State v. Sainz*, 84 N.M. 259, 501 P.2d 1247 (1972).

5. *See* Alaska Stat. § 11.81.450 (1979); Ark. Stat. Ann. § 41–209 (1977); Colo. Rev. Stat. § 18–1–709 (1978); Fla. Stat. Ann. § 812.028(4) (West Supp. 1980); Haw. Rev. Stat. § 702–237 (1976); N.J. Stat. Ann. § 2C:2–12 (West 1980 Special Pamphlet); N.Y. Penal Law § 40.05 (McKinney 1975); N.D. Cent. Code § 12.1–05–11 (1976); 18 Pa. Cons. Stat. Ann. § 313 (Purdon 1973); Tex. Penal Code Ann. tit. 2, § 8.06

(Vernon 1974); Utah Code Ann. § 76–2–303 (1978).

6. *See, e.g.*, W. LaFave & A. Scott, *Handbook on Criminal Law* 371 (1972); Donnelly, "Judicial Control of Informants, Spies, Stool Pigeons, and Agent Provocateurs," 60 Yale L.J. 1091 (1951); Comment, 31 U. Chi. L. Rev. 137 (1963). Other articles favoring the objective test are cited in Park, "The Entrapment Controversy," 60 Minn. L. Rev. 163, 167 n. 13 (1976).

Only two law review articles in the last 25 years have favored the subjective test, one of which favored abolishing the entrapment defense entirely. Y. Kamisar, W. LaFave and J. Israel, *Modern Criminal Procedure* 135 (4th ed.) (Supp. 1979).

requires all jurors to be questioned and therefore the trial court was within its rights in questioning only a part of the jury. However, I would think that we ought to interpret the rule to provide that where religious or racial discrimination may have affected the deliberations, all jurors that are available ought to be questioned, particularly in a criminal case.

For all of these reasons, I would reverse the conviction.

WAHL, Justice (dissenting).

I join in the dissent of Mr. Justice Yetka.