**In re WELFARE OF A.B.L.**

**In re WELFARE OF J.D.W.**

**Nos. C9–84–636, C0–84–637.**

Court of Appeals of Minnesota.

Nov. 20, 1984.

William E. Falvey, Chief Public Defender, Colia F. Ceisel, Asst. Public Defender, St. Paul, for A.B.L.

Tom Foley, Ramsey County Atty., Steven C. DeCoster, Asst. Ramsey County Atty., St. Paul, for the State.

William E. Falvey, Chief Public Defender, Marguerite M. McCarron, Asst. Public Defender, St. Paul, for J.D.W.

Heard, considered and decided by POPO-VICH, C.J., and PARKER and RANDALL, JJ.

## OPINION

PARKER, Judge.

Two juveniles were adjudicated delinquent by a referee of the Ramsey County Juvenile Court based on charges of aggravated robbery. After a hearing to determine probable cause, other Rasmussen issues concerning purported identifications made by two witnesses were incorporated into the trial on the merits. The referee suppressed identifications made by the witnesses and found appellants guilty. Subsequently the court granted defendants' motion for a new trial based upon the court's improper consideration of the failure of the defendant to call a witness at trial. By agreement of the parties, the new trial was submitted to the district court on the record made before the referee. After reviewing tapes of the earlier proceeding, the court entered an order sustaining the petition. Appellants contend the evidence was insufficient to sustain the petition and the arresting officer lacked probable cause to arrest them. We affirm.

## FACTS

On a November evening Kathleen Nedeau, 18, and Lisa Jerde, 16, parked on Seventh Place in downtown St. Paul to pick up some friends who were working in Town Square. The lighting was dim. As they were getting out of the car, two young black men approached and asked the time. Ms. Jerde said it was eight o'clock.

The youth who asked the time was about six feet from the car. Ms. Nedeau said he wore a blue jacket with a colored stripe about one and a half inches wide down the sleeve or across the chest. His companion remained behind the car; she thought he was wearing a dark brown jacket. Ms. Jerde also noticed that the first youth was wearing a blue coat with a red or yellow stripe, one and one half or two inches wide, across the front.

The girls got back in their car, and the two youths walked west along Seventh Place in the direction of Town Square. The girls watched them for about 25 seconds.

Between three and five minutes later, as the girls got out of their car, they heard a scream. They ran to the corner of Seventh and Minnesota Streets, where they found a woman lying on the ground. Ms. Nedeau observed two males running together three-fourths of a block away. She recognized them, from the back, as the same two males she had spoken to earlier. She said she recognized the blue jacket with the colored stripe.

Elvira Eggert, 54, the victim, testified that she was waiting at a bus stop on the southeast corner of Minnesota and Seventh when two black males who she thought were teenagers approached her. One was at her right side and the other was facing her. The youth facing her asked her what time it was. She looked at her watch and told them it was eight o'clock. This same person asked to see her watch. He took hold of her wrist, lifted it to look closer, and then jerked the purse off her wrist. Ms. Eggert lost her balance and fell. The two youths ran east around the corner of Sixth Street.

Lighting at the bus stop was poor, and she did not look at their faces. She is five feet, seven inches tall and said they were a bit taller than herself. They wore dark jackets which looked like blue windbreakers. She was not sure if there was color in their jackets.

St. Paul Police Officer DeWitt responded to a call reporting the purse-snatching. Ms. Eggert told him her purse contained two $20 bills, four $10 bills, three $1 bills, and $10 in food stamps in her purse. He also interviewed the two girls and put out a general description of the suspects.

Officer Howard Tucker also heard the initial purse-snatch report while patrolling downtown St. Paul in a squad car. Three to five minutes after the report, he saw two teenage black males walking south on Robert Street near Kellogg, five to six blocks from the crime scene. He testified that their presence aroused his curiosity because there were no attractions for young people in that area, particularly at that time of the evening. They turned west on Kellogg.

As Tucker turned west on Kellogg he heard a description of the suspects over the police radio; police were alerted to look for two black males in their mid-teens, one wearing a dark blue jacket with orange stripes and the other a two-tone jacket, possibly a blue jacket with an orange or red top.

Tucker made a U-turn back to Robert and Kellogg. He saw the same youths walk into the Y.W.C.A. at Kellogg and Minnesota, and he entered to look for them. Toward the rear of the Y.W.C.A. building he entered a room and heard a male voice ask, "how much money did you have" or "how much money do you have?" He found the same two black teenagers sitting at a lunch table. J.D.W. was sitting with his back to the door. A.B.L. was facing the door and was counting money, in bills, in his hands.

When A.B.L. saw the officer he put the money in his wallet and put the wallet in his pocket. When asked, they said they had come from the St. Anthony Hill area and were waiting at the Y.W.C.A. to meet their group home mother for a ride home. At trial their group home mother corroborated the fact that she was to meet the boys there that evening.

Tucker noted in his report that A.B.L. was five feet, seven inches tall, 140 to 150 pounds, and wore a dark blue jacket with orange shoulders. J.D.W. was five feet, six inches tall, about 130 pounds, and wore a dark blue jacket with a thin orange stripe on the sleeves and shoulders. Both were in their mid-teens.

At Tucker's request, A.B.L. produced the money he had in his wallet. He had one $20 bill, four $10 bills, and one $1 bill. J.D.W. emptied from his pockets two $20 bills, two $10 bills, and three $1 bills.

Ms. Eggert was asked to view the boys; she remained in the squad car as they were brought out into the lighted area in front of the Y.W.C.A. She testified that she could not identify them because she had

not seen their faces. She also testified that, at the time, she told Officer DeWitt that she did not know if these were the boys who snatched her purse. Officer DeWitt said he heard Ms. Eggert say "she felt that those were the two parties * * * I'm sure that was them" and seemed certain she had identified them. Officer Tucker reported that he understood DeWitt to have told him that she was not sure of her identification. Officer Collins, also present, testified that he did not think Ms. Eggert had been able to identify them.

The suspects were then taken to Town Square to be shown to Ms. Nedeau and Ms. Jerde. Neither said she could make an identification; however, at trial Ms. Nedeau testified that she could have identified them both at that time but that she did not because she was afraid of the way one of them had "looked" at her.

A.B.L. told police that he went downtown with only some change on him and that the money was given to him that evening as a birthday gift from his uncle, who they saw at a store where the uncle worked. J.D.W. said they got the money from A.B.L.'s uncle at a house they visited.

Several days later A.B.L. and J.D.W. were videotaped with three other young black males in a lineup. Ms. Eggert viewed the videotape and was unable to identify them. She made no identification at trial.

Ms. Nedeau and Ms. Jerde were both shown the videotape and identified A.B.L. and J.D.W. During the Rasmussen portion of the trial the referee ruled the videotapes impermissibly suggestive and suppressed the girls' lineup identification. The in-court identifications were suppressed on the same basis.

At trial the girls could not identify jackets seized from appellants as the ones worn by the youths they had talked to on the night in question. The coat taken from A.B.L. the evening of his arrest was blue on the bottom with orange yoke, shoulders and collar. The coat taken from J.D.W. was dark blue with two thin stripes going across the front and down the sleeves.

## ISSUES

1. Was the evidence sufficient for the trier of fact to find beyond a reasonable doubt that A.B.L. and J.D.W. were the persons who took Ms. Eggert's purse?

2. Did Officer Tucker have probable cause to arrest A.B.L. and J.D.W. after he entered the lunch room of the Y.W.C.A.?

## ANALYSIS

### I

In reviewing the sufficiency of the evidence in a criminal matter the court must view the evidence in a light most favorable to the verdict and decide whether the trier of fact could reasonably have found the defendant guilty of the crime charged. *Caldwell v. State*, 347 N.W.2d 824, 828 (Minn.Ct.App.1984) (quoting *State v. Olkon*, 299 N.W.2d 89, 106 (Minn.1980), *cert. denied*, 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981)). In its review of the evidence the court must give due regard to the presumption of innocence and to the State's burden of proving the defendant's guilt beyond a reasonable doubt. *See State v. Nash*, 342 N.W.2d 177, 179 (Minn. Ct.App.1984).

Appellants challenge the sufficiency of the identification evidence. Eyewitness identification evidence need not be certain, but the State must prove identity beyond a reasonable doubt. *State v. Armstrong*, 311 Minn. 541, 249 N.W.2d 176, 178 (1976). It is enough for a witness to testify that it is his "opinion, belief, impression, or judgment" that the defendant is the person he saw commit the crime. *State v. Senske*, 291 Minn. 228, 230, 190 N.W.2d 658, 660 (1971). Therefore, a conviction may be sustained when identification testimony is lacking or inconclusive as long as there is sufficient circumstantial evidence to prove beyond a reasonable doubt that the defendant committed the crime.

In *State v. Williams*, 337 N.W.2d 387 (Minn.1983), the victims of a burglary were able to identify only two of the three men

who robbed their house. However, a search of the third defendant's car, which had been seen parked near the burgled residence, resulted in the discovery of incriminating evidence, and the conviction was sustained. *Id.* at 389. Similarly, in *State v. Bellcourt*, 305 N.W.2d 340 (Minn. 1981), the court sustained a robbery conviction though there was no positive identification. In that case the robber wore a ski mask; evidence connecting the defendant to the car and the gun used by the robber, and testimony that the robber had unusually prominent dark eyebrows that the witnesses saw through the eyeholes of the mask, was sufficient to sustain the conviction.

■ We believe there was sufficient identification evidence, corroborated by circumstantial evidence, to prove beyond a reasonable doubt that appellants were the robbers. The victim testified, "it seemed like that these were the boys" but admitted she had not seen their faces. Ms. Nedeau testified that on the night of the crime she could have identified the two youths but did not tell the police because she was afraid. The latter testimony has not been stricken by the referee's Rasmussen rulings and provides a basis for the trial court to have made its finding.

The corroboration is strong. The two youths were found at a time and place near the crime. They had no satisfactory explanation for having spent the evening in an area possessing no attractions for young people. They were heard and seen dividing money. As soon as A.B.L. saw the police officer, he placed the money back into his wallet. The youths had come downtown with only small change in their pockets. A.B.L. explained his money ($61) as a birthday present from his uncle; J.D.W. had $63 and a similar explanation, although it was not his birthday or his uncle.

Additionally, the court could have considered discrepancies in the stories the youths told police that evening. A.B.L. explained that he received the money from his uncle at a store where his uncle worked; J.D.W. stated that they went to a house to get the money. The court could reasonably have concluded that their possession of bills in those denominations could best be explained as money taken from the victim's purse, with the excess attributable to the birthday gift from A.B. L.'s uncle.

## II

■ Probable cause to arrest exists where the objective facts would lead a person of ordinary care and prudence to entertain an "honest and strong suspicion" that the crime has been committed and that the defendant committed it. *State v. Liggons*, 348 N.W.2d 785, 787 (Minn.Ct.App.1984) (quoting *State v. Johnson*, 314 N.W.2d 229, 230 (Minn.1982)). On review an appellate court is limited to determining whether a trial court's finding of probable cause is clearly erroneous. *Liggons*, 348 N.W.2d at 788 (citing *United States v. McGlynn*, 671 F.2d 1140, 1143 (8th Cir.1982)). When reviewing probable cause the court should not be "overly technical, but should accept the officer's on-the-scene probable-cause assessment if reasonable men would under the same circumstances make the same determination." *Liggons*, 348 N.W.2d at 788 (quoting *State v. Compton*, 293 N.W.2d 372, 375 (Minn.1980)).

■ The State concedes that appellants were under arrest at the time Officer Tucker entered the lunchroom at the Y.W.C.A. The lower court's probable-cause assessment was based primarily on two factors: their proximity in time and location to the crime and the description of the suspects. Officer Tucker first observed the youths five or so minutes after the crime, when they were five or six blocks away. A.B.L. and J.D.W. also matched the general radio description of the suspects—black teenagers, wearing blue jackets with orange or red stripes. Those factors, combined with the officer's testimony that he overheard the remark, "how much money do (or "did") you have," and saw one of them counting money, amounted to probable cause to arrest them.

## III

 We view the procedure whereby the parties submitted the tape-recorded record, some of which is unintelligible, to the district court for final decision on the merits as fraught with the possibility of error. The failure to bifurcate the Rasmussen hearing from the trial on the merits, leaving both the trial court and the reviewing court to read suppressed evidence and attempt to divine the precise parameters of the suppression ruling, vastly increases the difficulty of maintaining fairness in the decision-making process. We suggest that parties must not, for the sake of convenience and economy, continue such procedures.

In a court where the defendant does not enjoy a right to trial by jury, the need for the factfinder to exercise, and be seen to exercise, meticulous care to protect the integrity of the trial process cannot be overstated. In the name of beneficence, the juvenile courts have been allowed to establish procedures somewhat at variance with our historical notions of fair trial procedure. To exacerbate this variance with careless procedures denies the juvenile defendant of the benefit of even this dubious bargain.

As our supreme court observed in *State ex rel. Rasmussen v. Tahash*, 141 N.W.2d 3, 14–15 (Minn.1965):

[T]he steps which have been suggested as a method of dealing with evidence of this type will indicate to counsel and to the trial courts that the pretrial consideration of other evidentiary problems, the resolution of which is needed to assure the integrity of the trial when conducted, will be most useful and that this court encourages the use of such procedures wherever practical.

Despite our misgivings as to the stipulated procedure, we hold that, viewing the evidence in the light most favorable to the verdict, the record contains sufficient evidence to sustain the convictions.

### DECISION

The evidence was sufficient to support the verdict of guilty, and probable cause existed for the officer to arrest the appellants. The failure to bifurcate the Rasmussen hearing from the trial on the merits is criticized.

Affirmed.