# STATE v. ANTHONY CHARLES GRILLI.

230 N. W. 2d 445.

May 9, 1975—No. 43549.

*C. Paul Jones*, State Public Defender, and *Mark W. Peterson*, Assistant State Public Defender, for appellant.

*Warren Spannaus*, Attorney General, *William B. Randall*, County Attorney, and *Steven C. DeCoster*, Assistant County Attorney, for respondent.

*George M. Scott*, Hennepin County Attorney, and *Henry W. McCarr, Jr.*, First Assistant Hennepin County Attorney, for Minnesota County Attorneys Association and Minnesota Urban County Attorneys Board, amici curiae, seeking affirmance.

KELLY, JUSTICE.[*]

Defendant appeals from a judgment of conviction for unlawful sale of a controlled substance under Minn. St. 1969, § 618.02, a felony for which defendant received a sentence of 5 to 20 years. Defendant presents three issues for this court to decide: (1) Whether the evidence was sufficient to sustain the verdict of an unlawful sale of a controlled substance; (2) whether he was denied a fair trial as a result of the state's failure to give a "Spreigl" notice regarding certain evidence, introduced on rebuttal, of criminal conduct not resulting in a criminal conviction; and (3) whether the conduct of the police officer involved constituted entrapment as a matter of law. For the reasons stated hereinafter, the case is remanded.

On November 8, 1970, Daryl Schmidt, an undercover narcotics agent for the St. Paul Police Department, entered Miller hospital under the name of David Shuck and by prior arrangement was placed in the bed next to defendant, a heart patient. Officer Schmidt testified he entered the hospital to attempt to purchase narcotics if they were being sold in the hospital, that he was not there to specifically induce a sale but to take the opportunity to purchase narcotics if such a sale were offered to him. On the first

---

[*] This case was reassigned to Mr. Justice Kelly.

day he merely engaged in small talk with defendant about work, their illnesses, etc., in an attempt to develop a trust relationship. Defendant asked Officer Schmidt if he had tried marijuana or other narcotics. The officer responded he liked "grass" but was afraid of LSD. Further conversation ensued during which defendant stated that he had connections and had access to marijuana, hashish, speed, opium, and acid and could get Schmidt some whenever he wanted. On the next day, defendant informed Schmidt that some employees in the hospital had access to drugs and that one of them, an orderly named Terry Larson, was "working for" him. During this 2-day period, several persons came to visit defendant, who later identified these visitors as members of his "family" and said that he took care of them and they would do anything for him. Among those persons who defendant told Schmidt were "family" members, were Willie Jones and Terry Larson, the orderly. Officer Schmidt also testified that on November 9 defendant gave one of his visitors, Willie Jones, two codeine capsules which had been given to defendant by nurses.

On the third day, November 10, defendant introduced Schmidt to Terry Larson who defendant stated owed him some favors and could get narcotics. When Officer Schmidt checked out of the hospital that afternoon he had not yet made a purchase, but expressed to defendant his hope that a sale of marijuana could be arranged. That evening, Officer Schmidt made a return visit to the hospital with some beer for defendant's consumption. Defendant at that time informed Schmidt he could get some "Panama Red" (marijuana) and could arrange a sale to Schmidt. Defendant then made a telephone call to Willie Jones, telling Jones, "I want you to treat him right, make sure he gets the good stuff." Schmidt and a fellow undercover police officer then contacted Jones at the location suggested by defendant and consummated a marijuana purchase.

Officer Schmidt again visited defendant on November 13, and defendant offered to sell him some grass. Terry Larson took

Schmidt to the male employees' locker room of the hospital where Larson sold him a quantity of marijuana.

After the state rested, the defense, for the purpose of showing entrapment as a defense, elicited testimony from Grilli and a Sergeant Russell W. Bovee. Grilli testified that Terry Larson, the orderly, had given him a pipeful of marijuana and that he, Grilli, had emptied its contents in a plastic bag and gave it to his secret contact, Sergeant Bovee, a policeman. Grilli's version of the facts varied considerably from the testimony of Officer Schmidt, Grilli claiming that Schmidt brought up the subject of drugs and continually urged Grilli to refer him to others through whom he might obtain drugs.

Defendant called as a witness Sergeant Bovee who identified himself as a member of the Law Enforcement Aid Unit (L.E.A.U.), a division of the St. Paul Police Department distinct from the narcotics division in which Schmidt worked. Bovee's division worked independently of all of the units in the department. There was no communication maintained between the persons working in Bovee's unit and those working in the narcotics division undercover section, all communication being taken care of by the first line supervisors. Bovee testified that since some date early in November (apparently including November 8 through 13), defendant, while hospitalized, was serving as an informant for him for the purpose of ferreting out possible drug pushers in the hospital. Bovee further stated that early in November defendant telephoned him from the hospital; he responded by visiting defendant who "informed [him] that there were parties and things taking place in the hospital in which employees over there were engaged in illegal use of narcotics." Sergeant Bovee asked defendant to acquire a sample of the narcotics that were being sold. The next evening Sergeant Bovee returned and defendant gave him a plastic bag containing what appeared to be marijuana. Upon later analysis, it turned out to be "very high-class, well-manicured marijuana," what is commonly known as "super pot." Bovee asked defendant "to find out

all he could about the party that was supposedly selling this stuff or gave him this stuff, or whatever." He received additional information thereafter from defendant concerning narcotics in the hospital but Sergeant Bovee's memory as to dates and time periods was uncertain. This time span apparently covered a period of more than 2 weeks. It should be noted that defendant admitted on cross-examination that he had not told Sergeant Bovee about Willie Jones.

The state granted immunity to Terry Larson. In rebuttal to the entrapment claim, Larson testified that in early November Grilli had a pipeful of marijuana in his hospital room and handed it to him and that he took a few puffs and gave it back. This was contrary to the defendant's testimony that Larson gave him a pipeful of marijuana and that he, Grilli, delivered the contents to Bovee. Larson also testified that defendant gave him three hand-rolled cigarettes filled with marijuana. He also corroborated Schmidt's testimony that Grilli told him to make the sale of marijuana to Schmidt. Moreover, he testified that the sale took place in Grilli's presence.

I. *Sufficiency of the Evidence*

Defendant contends that the evidence is insufficient to sustain the verdict of unlawful sale of a narcotic drug. Minn. St. 609.05 sets out the conduct which constitutes liability for the crimes of another. Subdivision 1 of § 609.05, reads:

"A person is criminally liable for a crime committed by another if he intentionally aids, advises, hires, counsels or conspires with or otherwise procures the other to commit the crime."

If a person's conduct qualifies under the statute, he is accused as a principal to the crime even though in common-law parlance, his conduct is that of an accessory. See, State v. Briggs, 122 Minn. 493, 142 N. W. 823 (1913); State v. Parker, 282 Minn. 343, 164 N. W. 2d 633 (1969). We hold that the evidence in this case which indicated that defendant telephoned a supplier of a controlled substance and arranged a sale thereof to Officer Schmidt was sufficient to support the verdict.

II. *Adequacy of the "Spreigl" notice*

Defendant argues, in addition, that certain evidence of other drug-related offenses was improperly admitted at trial. We are presented with the question of whether the evidence was admissible without pretrial notice pursuant to State v. Spreigl, 272 Minn. 488, 139 N. W. 2d 167 (1965). We held in Spreigl that where the state seeks to prove that an accused has been guilty of additional crimes and misconduct on other occasions, although such evidence is otherwise admissible under an exception to the general exclusionary rule, it shall not be received unless within a reasonable time before trial the state furnishes defendant in writing a statement of the offense it intends to show he has committed, described with the particularity required of an indictment or information, subject to the following exceptions: (a) Offenses which are part of the immediate episode for which defendant is being tried; (b) offenses for which defendant has previously been prosecuted; and (c) offenses which are introduced to rebut defendant's evidence of good character.

Here, a Spreigl notice was given to defendant informing him that the state would offer evidence of the November 13 sale of marijuana arranged by defendant between orderly Terry Larson and Officer Schmidt. However, the defendant received no such notice of other allegedly illegal drug-related acts which were mentioned in the testimony of two of the state's witnesses, namely:

(a) That defendant gave Willie Jones two capsules of codeine on November 9, as Schmidt testified;

(b) That defendant gave Terry Larson a pipeful of marijuana and three marijuana cigarettes in early November but before November 8, as Larson testified on rebuttal.

The only question presented to us is whether defendant's misconduct falls within the "immediate episode" exception to the notice requirement of Spreigl. In State v. Whelan, 291 Minn. 83, 189 N. W. 2d 170 (1971), there was testimony that defendant had committed a number of other sexual acts with the same vic-

tim. This court concluded that such acts on dates subsequent to the date of the alleged offense and at different locations were not part of the immediate episode but that the error was not prejudicial for other reasons. Likewise, in this case, the transfer of codeine on November 9 and possession of a pipeful of marijuana and three marijuana cigarettes sometime in the early part of November were transactions which were not part of the "immediate episode" of November 10 for which defendant was being tried.

The underlying purpose of the Spreigl notice is to avoid surprise to the defendant by giving him time to prepare a defense to the charges. State v. Whelan, *supra*. Such is the case here, where the defense was well aware prior to trial of the state's intention to proceed with its presentation in a chronological manner, treating the November 9 through November 13 period as one behavioral incident. Defense counsel was aware of the state's intent before the trial began and was thus estopped from claiming surprise. In addition, when these unrelated incidents were brought out at the trial, no Spreigl objections were interposed by the defense. If we were to order new trials where defense counsel did not object to the evidence, it would become customary defense strategy to refrain from objecting and then attempt to get another chance at a jury trial if the defendant is convicted. On this basis alone we could say that defendant waived his objection. In addition, these acts were not particularly stressed by the state. We view defendant's claims of error as harmless at most.

Where, as here, defendant in a prosecution for the illegal sale of narcotics invokes the defense of entrapment, evidence of prior sales by the defendant is admissible to rebut the defense by showing a predisposition to commit the crime charged. As stated in Sorrells v. United States, 287 U. S. 435, 451, 53 S. Ct. 210, 216, 77 L. ed. 413, 422 (1932):

"* * * [I]f the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching

inquiry into his own conduct and predisposition as bearing upon that issue."

Testimony as to the transfer by defendant to Larson of the pipeful of marijuana and the three marijuana cigarettes was given by Larson subsequent to defendant's testimony and was proper rebuttal to the claimed defense of entrapment. The testimony by Officer Schmidt as to the transfer of the two codeine capsules by defendant to Jones should not have been permitted. However, because it was not objected to and could have been introduced in rebuttal to the evidence offered by defendant to show entrapment, it was harmless error.

Indeed, in many cases the prosecution would have no reason to anticipate an entrapment defense. When such is presented by the defendant at trial, the prosecution is the one surprised and should have the opportunity on rebuttal to show predisposition by evidence of prior illegal acts without being hampered by a rule requiring pretrial notice where the prosecution was unaware that such a defense would be proffered at trial and thus raise the need for evidence of collateral criminal conduct.

The problem presented above will not occur under the new procedure for the handling of the entrapment defense, *infra*. Since the defense must give notice to the court and prosecution within a reasonable time prior to trial of its intention to rely on the entrapment defense, the prosecutor will then be aware of the need for evidence of collateral conduct and will give the appropriate Spreigl notice in response. If a defendant elects to have the court decide the issue of entrapment at a pretrial evidentiary hearing, the need for evidence of criminal conduct to disprove entrapment will not arise at any subsequent jury trial. If, on the other hand, a defendant elects to present his defense to the jury, he can be given a Spreigl notice and cannot claim surprise by the state's rebuttal evidence.

III. *Entrapment*

Defendant challenges his conviction on the grounds that he was entrapped into the commission of the offense and that the

court gave erroneous instructions to the jury on the elements of that defense. The trial court applied State v. Poague, 245 Minn. 438, 72 N. W. 2d 620 (1955), which held that entrapment exists only where the "criminal intent" originates in the enforcement officials of the government rather than in the mind of the accused. This is the prevailing theory in both Federal and state courts and after a careful review of all authorities cited to us, we do not believe it wise to depart from that theory. Even so, the judicial procedures relating to the defense of entrapment do require examination.

The Poague case defined entrapment by setting out the parameters of the defense:

"* * * The generally recognized principle of entrapment as a defense is well stated in the case of Newman v. United States (4 Cir.) 299 F. 128, 131, as follows:

" '* * * When the criminal design originates, not with the accused, but is conceived in the mind of the government officers, and the accused is by persuasion, deceitful representation, or inducement lured into the commission of a criminal act, the government is estopped by sound public policy from prosecution therefor.'

"Entrapment exists where it appears that officers of the law lured the accused into committing an offense which he otherwise would not have committed and had no intention of committing. However, the general rule is that it is not unlawful to provide a person with the opportunity to voluntarily and deliberately do what there was reason to believe he would do if afforded the opportunity." 245 Minn. 443, 72 N. W. 2d 624.

The decisions of the United States Supreme Court, while generally following this definition, also define entrapment as the instigating or manufacturing of crime by law enforcement officers. Sorrells v. United States, 287 U. S. 435, 53 S. Ct. 210, 77 L. ed. 413 (1932) (Mr. Chief Justice Hughes); Sherman v. United States, 356 U. S. 369, 78 S. Ct. 819, 2 L. ed. 2d 848 (1958)

(Mr. Chief Justice Warren) ; United States v. Russell, 411 U. S. 423, 93 S. Ct. 1637, 36 L. ed. 2d 366 (1973) (Mr. Justice Rehnquist).

In order to decide whether defendant was entrapped, focus must be placed on the necessary elements of the defense. The long-established, presently prevailing majority rule associated with the majority opinions in the three United States Supreme Court cases, Sorrells, Sherman, and Russell, has been termed the "subjective" test. United States v. Russell, 411 U. S. 423, 440, 93 S. Ct. 1637, 1647, 36 L. ed. 2d 366, 378 (Mr. Justice Stewart dissenting). In the majority view, the inquiry on entrapment is concerned primarily with the element of defendant's predisposition: whether it was his own original intent to commit the crime charged. The defense must show that the actions of the police went further than those necessary to produce evidence of the defendant's criminality.[1] However, where the state can show the defendant's "predisposition" by evidence of (a) defendant's active solicitation to commit the crime, (b) prior criminal convictions, or (c) prior criminal activity not resulting in conviction (as here), or (d) defendant's criminal reputation, or by any other adequate means the challenged conduct of the state's officers is mitigated or excused, and the defense of entrapment is not proved. The issue has traditionally been submitted to the jury for determination following instruction from the court based on the "subjective" approach.

The minority view espoused in Sorrells, Sherman, and Russell in opinions by Mr. Justice Roberts (concurring in Sorrells), Mr. Justice Frankfurter (concurring in Sherman), and Mr. Justice Stewart (dissenting in Russell), as well as the four state courts of Iowa, Michigan, New Mexico, and Alaska,[2] focuses not

---

[1] Starrs, *Working Papers of the National Commission on Reform of Federal Criminal Laws,* Comment on Entrapment, pp. 306, 314.

[2] State v. Mullen, 216 N. W. 2d 375, 382 (Iowa 1974); People v. Turner, 390 Mich. 7, 21, 210 N. W. 2d 336, 342 (1973); Grossman v. State, 457 P. 2d 226, 229 (Alaska 1969); State v. Sainz, 84 N. Mex. 259, 261, 501 P. 2d

upon the *"predisposition"* of the defendant to commit crimes, but rather on the *inducement* of the state.

In his concurring opinion, Mr. Justice Frankfurter in the Sherman case, 356 U. S. 369, 383, 78 S. Ct. 819, 826, 2 L. ed. 2d 848, 857, stated:

"This [the application of the objective test urged by Mr. Justice Frankfurter] does not mean that the police may not act so as to detect those engaged in criminal conduct and ready and willing to commit further crimes should the occasion arise. Such indeed is their obligation. It does mean that in holding out inducements they should act in such a manner as is likely to induce to the commission of crime only these persons and not others who would normally avoid crime and through self-struggle resist ordinary temptations. This test shifts attention from the record and predisposition of the particular defendant to the conduct of the police and the likelihood, objectively considered, that it would entrap only those ready and willing to commit crime. It is as objective a test as the subject matter permits, and will give guidance in regulating police conduct * * *. The power of government is abused and directed to an end for which it was not constituted when employed to promote rather than detect crime and to bring about the downfall of those who, left to themselves, might well have obeyed the law. Human nature is weak enough and sufficiently beset by temptations without government adding to them and generating crime."

This minority view probably had its genesis in Mr. Justice Brandeis' dissenting opinion in Casey v. United States, 276 U. S. 413, 423, 48 S. Ct. 373, 376, 72 L. ed. 632, 636 (1928), wherein he said the government "may not provoke or create a crime and then punish the criminal, its creature." Mr. Justice Stewart's dissent in Russell summarized the minority view as follows (411 U. S. 440, 93 S. Ct. 1647, 36 L. ed. 2d 378):

---

1247, 1249 (1972). See, also, the California modification of the minority position, People v. Benford, 53 Cal. 2d 1, 11, 345 P. 2d 928, 935 (1959).

"The concurring opinion of Mr. Justice Roberts, joined by Justices Brandeis and Stone, in the *Sorrells* case, and that of Mr. Justice Frankfurter, joined by Justices Douglas, Harlan, and Brennan, in the *Sherman* case, took a different view of the entrapment defense. In their concept, the defense is not grounded on some unexpressed intent of Congress to exclude from punishment under its statutes those otherwise innocent persons tempted into crime by the Government, but rather on the belief that 'the methods employed on behalf of the Government to bring about conviction cannot be countenanced.' *Sherman v. United States, supra,* at 380. Thus, the focus of this approach is not on the propensities and predisposition of a specific defendant, but on 'whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power.' *Id.,* at 382. *Phrased another way, the question is whether—regardless of the predisposition to crime of the particular defendant involved—the governmental agents have acted in such a way as is likely to instigate or create a criminal offense.*" (Italics supplied in part.)

Mr. Justice Roberts in Sorrells, Mr. Justice Frankfurter in Sherman, and Mr. Justice Stewart in Russell, as well as Mr. Justice Brandeis in Casey v. United States, *supra,* all urged that entrapment be not a *defense* determined by the jury but rather a *bar* to prosecution determined by the court. Mr. Justice Stewart stated it this way in Russell (411 U. S. 441, 93 S. Ct. 1647, 36 L. ed. 2d 379) :

"* * * Under this approach, the determination of the lawfulness of the Government's conduct must be made—as it is on all questions involving the legality of law enforcement methods—by the trial judge, not the jury."

In disposition of the case before us, we maintain our support of the majority view as expressed in Sorrells, Sherman, and most recently in Russell, that "predisposition" as well as "inducement" should be considered when the entrapment issue arises before (or

during) trial. We therefore adhere to the "subjective" approach in so far as it retains "predisposition" as an ingredient of entrapment cases.

In United States v. Russell, *supra*, a government undercover narcotics agent supplied an essential ingredient (phenyl-2-propanone) to the defendant so that he could manufacture a synthetic narcotic (methamphetamine or "speed"). The agent by prior agreement with the defendant then received half of the quantity manufactured. The defendant was convicted for the unlawful sale, possession, and manufacturing of methamphetamine. The Court of Appeals for the Ninth Circuit in a 2-1 decision[3] reversed and held the supplying of the propanone (in itself not illegal to possess but extremely difficult to obtain) for the purpose of encouraging the manufacture of an illegal narcotic constituted an intolerable degree of governmental participation in the criminal enterprise. The government appealed to the United States Supreme Court. The court in a 5-to-4 decision written by Mr. Justice Rehnquist reversed and held that the supplying of the necessary (but not illegal) ingredient by the government agent was not entrapment as a matter of law, and that the issue of entrapment had been properly submitted by the district court under the Sorrells-Sherman doctrine of entrapment.

In reaffirming the majority view, Mr. Justice Rehnquist minced no words concerning several lower court decisions[4] which in recent years had adopted the "objective" approach:

"Several decisions of the United States district courts and courts of appeals have undoubtedly gone beyond this Court's opinions in *Sorrells* and *Sherman* in order to bar prosecutions because of what they thought to be, for want of a better term, 'overzealous law enforcement.' But the defense of entrapment

---

[3] 459 F. 2d 671 (9 Cir. 1972).

[4] United States v. Bueno, 447 F. 2d 903 (5 Cir. 1971); United States v. Chisum, 312 F. Supp. 1307 (C. D. Cal. 1970); Greene v. United States, 454 F. 2d 783 (9 Cir. 1971).

enunciated in those opinions was not intended to give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it did not approve. * * * We think that the decision of the Court of Appeals in this case quite unnecessarily introduces an unmanageably subjective standard which is contrary to the holdings of this Court in *Sorrells* and *Sherman*." 411 U.S. 435, 93 S. Ct. 1644, 36 L. ed. 2d 375.

So also here we decline to adopt the approach suggested by defendant. To determine entrapment we must distinguish between the "trap for the unwary innocent and the trap for the unwary criminal." If the latter is the target, there is no entrapment. Where, as here, we have situations involving drug pushers, the practicalities and realities are such that convictions would be almost nonexistent if the "objective" theory of entrapment were adopted. If the evidence adduced by the prosecution is accepted, then it becomes clear that the defendant was no unwary innocent person. On the contrary, he knew the "ins and outs" of illegal drug trafficking.[5] It is difficult to imagine any drug pusher selling to a stranger. Thus, the need for undercover agents and informers who of necessity must play the part of the willing drug buyer, user, or addict becomes obvious. As Mr. Justice Rehnquist pointed out in Russell:

"The illicit manufacture of drugs is not a sporadic, isolated criminal incident, but a continuing, though illegal, business enterprise. In order to obtain convictions for illegally manufacturing drugs, the gathering of evidence of past unlawful conduct frequently proves to be an all but impossible task. Thus in drug-related offenses law enforcement personnel have turned to one of the only practical means of detection: the infiltration of drug rings and a limited participation in their unlawful present prac-

---

[5] Terry Larson testified that when he was directed by the defendant to sell marijuana to Officer Schmidt (posing as another patient), that the defendant said "he is cool" and that he, Larson, took that to mean Schmidt was not a police officer.

tices. Such infiltration is a recognized and permissible means of investigation; if that be so, then the supply of some item of value that the drug ring requires must, as a general rule, also be permissible. For an agent will not be taken into the confidence of the illegal entrepreneurs unless he has something of value to offer them. Law enforcement tactics such as this can hardly be said to violate 'fundamental fairness' or 'shocking to the universal sense of justice.' " 411 U. S. 432, 93 S. Ct. 1643, 36 L. ed. 2d 373.

Nor do we find anything shocking or outrageous about the investigative efforts of Officer Schmidt in his attempt to discover who was pushing drugs in the hospital, nor in his manner of procuring a purchase of marijuana through the defendant.

Nor was any independent constitutional right of the defendant violated so as to create a due process issue. That argument was raised and dismissed in Russell with a comment applicable here:

"While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. *Rochin v. California*, 342 U. S. 165 [72 S. Ct. 205, 96 L. ed. 183] (1952), the instant case is distinctly not of that breed." 411 U. S. 431, 93 S. Ct. 1643, 36 L. ed. 2d 373.[6]

The conduct of Officer Schmidt did not violate the Fourth or Fifth Amendment rights of defendant so as to require application of the exclusionary rule, as has been done with illegal searches and seizures, Mapp v. Ohio, 367 U. S. 643, 81 S. Ct. 1684,

---

[6] It is interesting to note that in United States v. Oquendo, 490 F. 2d 161 (5 Cir. 1974), the court of appeals held that regardless of a person's willingness to sell drugs, he cannot be convicted of the possession or sale of narcotics furnished to him by a government informer and concluded that its decision was not inconsistent with Russell. For a discussion of this decision, see Comment, 59 Minn. L. Rev. 444.

The kind of conduct by law enforcement officers that will not be acceptable and should bar a given prosecution probably is best approached on a case-by-case basis.

6 L. ed. 2d 1081 (1961), and illegal confessions, Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694 (1966).

In addition to the question of what legally constitutes entrapment, we now address ourselves to the procedural question of to whom entrapment will be presented, the court or the jury. In our view, entrapment should no longer be left in all instances as a defense to be determined by the jury. In order that the concerns which we have spoken of today are resolved and that a proper balance may be struck between the obligations of law enforcement and the rights of the accused who raises the defense of entrapment, we hereby promulgate a new procedure to be applied in all cases tried after the date of this decision.

We hold that, following complaint or indictment and at a time prior to the commencement of trial, a defendant shall elect whether to have his claim of entrapment presented in the traditional manner as a defense to the jury, or to have it heard and decided by the court as a matter of law. He shall give notice of such election to the court and prosecution, setting forth the basis for the claim of entrapment in reasonable detail. If the defendant elects to have the court hear the claim, he must in open court or in writing waive a jury trial as to that issue. Such a matter can be heard at a pretrial evidentiary hearing similar to that held for suppression of evidence as set forth in State ex rel. Rasmussen v. Tahash, 272 Minn. 539, 141 N. W. 2d 3 (1965). Trial judges may consider the entrapment issue at the so-called "Rasmussen" hearing if one is held. Hearing and consideration of the issue will take place at the "omnibus" hearing under the soon-to-be effective Rules of Criminal Procedure. The trial court shall make findings of fact and conclusions of law on the record. If the court decides that defendant was entrapped into the commission of the crime charged, this will be a bar to further prosecution for that charge. The state may appeal this decision under Minn. St. 632.11. If the court holds that there was no entrapment, the issue is closed and defendant may not present the defense to the jury. However, as always, the defendant pursuant to Minn.

St. 632.01 has the right to appeal from any resultant conviction with the pretrial denial of his entrapment claim a possible ground for reversal.

In the alternative, defendant may elect to have his claim presented as a defense to be decided by the jury.

Whether the decision is to be made by the court or jury, the evidence presented should focus on two questions:

(1) Did the criminal conduct initiate with the police rather than with the defendant?[7]

(2) Did the defendant have a predisposition to commit the crime?

As to these inquires: "* * * [A]t trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an 'appropriate and searching inquiry into his own conduct and predisposition' as bearing on his claim of innocence." Sherman v. United States, 356 U. S. 369, 373, 78 S. Ct. 819, 821, 2 L. ed. 2d 848, 851.

The burden is on the defendant to raise by a fair preponderance of the evidence the issue of entrapment for consideration by the court or jury, as he elects. Once such an issue is raised, the burden is on the state to prove beyond a reasonable doubt that the accused was predisposed to commit the crime charged. United States v. Mosley, 496 F. 2d 1012, 1014 (5 Cir. 1974).

In this case, although the learned trial judge properly in-

---

[7] Commenting on Sherman v. United States, 356 U. S. 369, 78 S. Ct. 819, 2 L. ed. 2d 848 (1958), and United States v. Russell, 411 U. S. 423, 93 S. Ct. 1637, 36 L. ed. 2d 366 (1973), the author of Comment, 55 Minn. L. Rev. 444, 446, states: "Not all government inducements result in entrapment, however. The majority's approach permits the police to encourage one who is 'awaiting any propitious opportunity to commit the offense,' on the rationale that exposure of certain crimes requires the police to provide suspects with 'opportunities or facilities' necessary to their accomplishment."

As stated in the syllabus, we are reaffirming the subjective test of entrapment as set forth in State v. Poague, 245 Minn. 438, 72 N. W. 2d 620 (1955).

structed the jury on the issue of entrapment, we feel that because of the confusion resulting from having one police officer investigating defendant while another police officer used him as an informer, apparently without either officer knowing of the other's activities, defendant should be permitted to have the trial court determine if indeed there was entrapment in this case. Such a finding, if made, will be a bar to further prosecution and will void defendant's conviction.

Remanded for the limited purpose of permitting the defendant to have the trial court determine, after an evidentiary hearing on the issue, whether there was entrapment.

MR. CHIEF JUSTICE SHERAN and MR. JUSTICE SCOTT took no part in the consideration or decision of this case.