**STATE of Minnesota, Respondent,**

v.

**Stanley Paul OLSON, Appellant.**

**No. C5–84–1105.**

Court of Appeals of Minnesota.

Feb. 5, 1985.

Review Granted April 11, 1985.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Robert M.A. Johnson, Anoka Co. Atty., J. Diane Savage, Asst. Anoka Co. Atty., Anoka, for respondent.

C. Paul Jones, State Public Defender, Minneapolis, for appellant.

Considered and decided by POPOVICH, C.J., and RANDALL and CRIPPEN, JJ., with oral argument waived.

## OPINION

RANDALL, Judge.

Appellant was convicted of receiving stolen property and received the maximum presumptive sentence allowed by the Minnesota Sentencing Guidelines for a severity level VI offense coupled with appellant's criminal history score of 6. Appellant admitted selling an automobile that he had reason to know was stolen.

Appellant challenges his conviction and sentence on the grounds that: he was denied a fair trial due to the trial court's refusal to compel the state to reveal the identity of the state's informant; the state failed to establish beyond a reasonable doubt appellant's willingness to commit a crime; the trial court erred in failing to apply the "due process defense" in light of the government agent's outrageous conduct in the case; and entrapment. He appeals his sentence on two grounds. He argues in the alternative that he should

have been sentenced pursuant to severity level V or, if sentenced for a severity level VI, he was entitled to a downward departure to the presumptive sentence for a severity level V due to mitigating factors.

We affirm the conviction but reverse and impose the presumptive sentence for severity level V.

## FACTS

Appellant Stanley Olson has been convicted and sentenced for a number of property offenses between 1974 and 1982. He was paroled in 1982 and began working in Delano, Minnesota, where he became acquainted with a fellow worker, James Zakarte. During a conversation between the two men, Zakarte brought up the topic of gold. Olson told Zakarte that he had been buying gold but did not think it was real. Zakarte knew how to test for gold, and the two men began to test any gold Olson acquired. Between December 1982 and February 1983 Zakarte purchased any real gold Olson tested.

Also during this period, Zakarte became acquainted with a friend of Olson's who had recently broken both of her legs. Zakarte began supplying her with Percodan for her pain and asked for payment from Olson in gold.

On May 4, 1983, Olson called Zakarte and offered to sell him a camera. Zakarte was not interested but told Olson he had a friend who would probably buy it. Olson got the impression Zakarte's friend was a fence who would buy anything you brought to him.

Zakarte's friend was Dennis Owens, an undercover agent for the Minnesota Bureau of Criminal Apprehension, who at the time was involved in a multi-county undercover operation. As part of this operation, Owens had made contact with Zakarte, and on May 4 Zakarte telephoned Owens and told him that Olson had some stolen property for sale.

A meeting was arranged for May 4, 1983, where Zakarte introduced Olson to agent Owens. After a short conversation in the cafe, Olson and Owens went out to Olson's car where Olson offered to sell Owens some jewelry and a camera that Olson said he had just stolen from south Minneapolis. Agent Owens purchased the camera, which he was later able to verify as stolen from south Minneapolis. At this meeting, agent Owens gave Olson a telephone number where he could be reached.

On May 27, 1983, Olson again telephoned Owens with an offer to sell a guitar and another camera. Agent Owens purchased the camera, later confirmed as stolen from south Minneapolis.

Agent Owens testified that the next contact he had from appellant Olson was a telephone call in mid-June 1983, during which Olson asked if Owens would be interested in buying a car. Owens told Olson to call back if and when he had one to sell. On June 23, 1983, Zakarte telephoned agent Owens and told him Olson had a car for sale, and if Owens was interested he should meet Olson at the K-Mart Shopping Center in Columbia Heights later that day.

Owens and other witnesses for the state testified that Owens and undercover agent Marvin Seman drove to the K-Mart lot in an unmarked BCA van accompanied by a separate backup surveillance team of BCA agents John Fossum and Terril Smith. Upon arrival, Owens found Olson sitting in a van in the parking lot. Olson pointed to a blue Pontiac with Wisconsin license plates parked in the lot and told Owens that was the car for sale. Owens, Seman, and Olson went to inspect the car. Olson unlocked both the driver's door and the trunk. When the trunk was opened, Olson noticed a piece of paper inside which he grabbed, crumpled, and put in his pocket saying, "Well, we won't leave that in there."

Agent Owens told Olson he wanted to test drive the car before talking prices, so he and Olson got in the car and Owens drove for a short distance. As he was driving, Owens noted the gas level was low. Olson explained that he had driven the car from the upper peninsula of Michigan or Wisconsin to the lot on only three-

quarters of a tank of gas. Olson further explained that he got the car from the parking lot of a motel somewhere in Michigan or Wisconsin. Owens asked if Olson had "hot-wired" the car, but Olson said "no," the keys were in the car and it was real easy to take it. Owens asked if the car was reported stolen. Olson replied that he was sure it had been reported stolen in the place where it had come from but that was outside Minnesota, so Owens was not to worry. Olson just cautioned Owens to drive the care carefully and to use his turn signals.

After the test drive, the two men discussed price. Olson wanted $500, Owens offered $400, and they compromised at $450. At that point Olson also offered to sell some furs and a diamond ring, but Owens said he was not interested. The two also discussed the possibility of Olson obtaining some guns, but Olson said the person who had the guns for sale was "flaky" so Olson told Owens he had decided to pass on that deal. Owens paid Olson the $450 and they parted, agreeing to keep in touch with each other.

Owens later confirmed that the Pontiac had been reported stolen from Phillips, Wisconsin on June 22, 1983. The evening before, Bruce Reinke, the car's owner, had left the car with keys in it parked in front of the Skyline Motel in Phillips, Wisconsin. Reinke testified that the car was worth $5,500, which was the amount the insurance company would reimburse him based on NADA book value.

Appellant Olson's testimony differs markedly regarding the sale of the car to agent Owens. Olson testified that on June 23, 1983, he called Zakarte to see if he could get some pain pills for his friend. The two arranged to meet in the K-Mart parking lot, where Zakarte gave Olson's friend the pills. Then Zakarte showed Olson the Pontiac in the lot and told Olson that if he would sell the car for him to Owens, he could keep half the money. Olson admitted he knew the Pontiac was stolen. Zakarte instructed Olson to tell Owens that he, Olson, had stolen the car from

the upper peninsula of Michigan near the Wisconsin border and had driven it back. With those instructions Zakarte left, Owens arrived, and Olson sold the car. Olson did not, however, split the money with Zakarte because he felt Zakarte owed him money for back supplies of gold.

## ISSUES

1. Was appellant denied a fair trial because the trial court denied appellant's motion to compel the state to identify the informant and to allow appellant to question law enforcement officers about the use of informants in this case?

2. Does the record contain sufficient evidence to sustain the verdict?

3. When appellant was convicted of receiving stolen property with a value of at least $1,000, was it proper for the court to impose a sentence based on the offense of receiving stolen property with a value over $2500 in the absence of a jury verdict to that effect?

4. Do compelling reasons exist for a downward durational departure from the Minnesota Sentencing Guidelines because appellant's participation in the sale of stolen property was minimal?

## ANALYSIS

### I.

*Informant identity*

Appellant contends that he was denied a fair trial because the trial court denied his pre-trial motion to compel disclosure of the identity of the government informant, Zakarte, and denied appellant the opportunity to cross examine BCA agents regarding their use of Zakarte in this case.

The informant's privilege is the government's privilege to withhold the identity of persons furnishing information to law enforcement officers. *Roviaro v. United States,* 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957). The purpose of the privilege is to further and protect the public interest in effective law

enforcement. *Id.* However, the privilege is subject to concepts of fundamental fairness, and when disclosure of the informer's identity, or the contents of his communications, is relevant to the defense of the accused, the privilege must give way. *Id.*

■ Generally, when an informant is a mere transmitter of information and not an active participant so is not a competent witness to the crime itself, the informant's name need not be disclosed. *State v. Villalon*, 305 Minn. 547, 549, 234 N.W.2d 189, 191 (1975). The decision turns on the element of the informer's presence or participation in the criminal transaction. *Id.* Disclosure of an informant's identity is not generally required when the only participation by the informant in the crime is to bring together the defendant and the government agent. *State v. Werber*, 301 Minn. 1, 1, 221 N.W.2d 146, 150 (1974).

■ Specific factors a trial court should consider when determining whether disclosure of the identity of an informant is necessary to a fair trial include:

(a) whether the informant was a material witness;

(b) whether the informer's testimony will be material to the issue of guilt;

(c) whether the testimony of the law enforcement officer is suspect;

(d) whether the informant's testimony might disclose entrapment. *Syrovatka v. State*, 278 N.W.2d 558, 561–62 (Minn.1979).

■ There is no evidence in the record, nor was there reason to believe at the pre-trial motion hearing that the law enforcement officers' testimony in the case was suspect. Nor was there evidence that the informant was a necessary material witness. Since Zakarte was only responsible for bringing appellant and agent Owens together and did not actively participate in the crime, disclosure of Zakarte's identity was not required.

■ More importantly, a defendant cannot claim prejudice due to a court's denial of his request to compel the state to name the informant when the defendant already knows the informant's name. *State v. Villalon*, 305 Minn. at 550, 234 N.W.2d at 191. The Minnesota Supreme Court held in *Villalon* that "inasmuch as defendant knew the informant's identity for many months, it was his responsibility to secure his attendance as a trial witness." *Id.* at 550, 234 N.W.2d at 192.

■ Here appellant Olson fails to establish prejudice since he knew Zakarte's name and knew of Zakarte's connection with the case. *The defense had in fact subpoenaed Zakarte*, and although he was present in the courtroom during trial he was never called as a witness.

## II.

### Sufficiency of evidence

Appellant claims the evidence introduced at trial was insufficient to support the verdict. He claims that the state failed to prove beyond a reasonable doubt his willingness to commit a crime in light of his valid entrapment defense and that actions of government agents in the case were so outrageous as to bar the entry of a criminal conviction as a matter of law.

A. When considering questions of insufficiency of the evidence, a reviewing court is limited to ascertaining whether, given the facts in the record and the legitimate inferences that can be drawn from these facts, a jury could reasonably conclude that the defendant was guilty of the offense charged. *State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978). The reviewing court cannot retry the facts, but must take the view of the evidence most favorable to the state and must assume that the jury believed the state's witnesses and disbelieved any contradictory evidence. *Id.* If the jury could reasonably have found the defendant guilty, the verdict will not be reversed. *Id.* Arguably the jury's verdict contained an implicit rejection of appellant's entrapment defense.

■ Entrapment is a predisposition based defense. Generally, the defendant has the burden of raising the defense by

showing by a fair preponderance of the evidence that an agent of the government initiated the idea of criminal conduct. *State v. Ford,* 276 N.W.2d 178, 182 (Minn. 1978). However, no matter how involved the government is in inducing the commission of a crime, the defense of entrapment will not bar conviction, absent outrageous conduct, if the government can prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. *Id.*

▮▮▮ The principle of the entrapment defense focuses on where the criminal design originated. If the criminal design originated, not in the mind of the accused but in the mind of government officers, and the accused is induced or lured into the commission of a crime, the government is estopped by sound public policy from prosecution. *State v. Grilli,* 304 Minn. 80, 88, 230 N.W.2d 445, 451 (1975). The defense must show that the state did something more than merely solicit the commission of the crime. *State v. Olkon,* 299 N.W.2d 89, 107 (Minn.1980). Something in the nature of persuasion, badgering, or pressure by the state must occur before the inducement element is satisfied. *Id.*

▮▮▮ The record supports the jury's rejection of appellant's entrapment defense. Agent Owens testified that appellant called him a week before selling him the Pontiac to ask if he would buy a car. During the car sale, appellant also offered to sell Owens other items and agreed to keep in touch with Owens. In addition, the jury could reasonably have concluded that appellant's detailed description of the features on the car and the circumstances surrounding appellant's pick up of the car in Wisconsin were inconsistent with his testimony that Zakarte had given appellant the car to sell only minutes before.

▮▮▮ B. Appellant also argues that his conviction should be barred by the due process defense. The due process defense is a legal defense which is left for the trial court to apply. *State v. Ford,* 276 N.W.2d at 182. The defense arises out of concepts of fundamental fairness and prevents a conviction of even a predisposed defendant if the conduct of the government officials in participating in or inducing the commission of the crime is sufficiently outrageous. *Hampton v. United States,* 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976). The *Hampton* court held that the predisposed defendant's due process was not violated when government agents acted both as supplier and subsequent purchaser of narcotics. *Id.* at 490–91, 96 S.Ct. at 1650–51.

Under *Hampton,* if Zakarte did supply appellant with the stolen Pontiac, his action was not per se sufficiently outrageous to trigger a due process defense. In addition, appellant's own testimony fails to support his claim that Zakarte's conduct in encouraging appellant to engage in crime was sufficiently outrageous to prevent conviction. Appellant implies that Zakarte reinforced appellant's criminal activity by supplying his friend with Percodan. However, appellant testified that his friend was able after a time to get drugs directly from Zakarte. Appellant also testified that *he* called Zakarte to see if Zakarte wanted to buy stolen property other than gold. From the record, Zakarte's role throughout appears to be primarily that of a go-between, the standard middleman informer.

### III.

*Sentencing*

Appellant was sentenced to 73 months, the maximum presumptive sentence under state guidelines for receiving stolen property valued at over $2,500 (severity level VI) by someone with appellant's criminal history (6). Appellant does not dispute his criminal history score, but does claim that the trial court incorrectly applied the sentencing guidelines. Appellant argues that since the only interrogatory to the jury on value asked whether the stolen car was worth $1,000 or more, under the guidelines he was convicted of a severity level V offense and thus the presumptive sentence for a severity level VI was improper.

We agree. A sentence based on severity level VI is proper only when a defendant is found guilty of receiving stolen property valued *at more than $2500.* Minnesota Sentencing Guidelines and Commentary V.

The sentencing guidelines add a value element in the offense severity reference table which is not present in the Minnesota statute controlling receiving stolen property. That statute, Minn.Stat. § 609.53, cites value levels of $1,000 or more (felony); $301 to $999 (felony); and $300 or less (misdemeanor). The Minnesota guidelines offense severity reference table breaks up the two felony levels of receiving stolen property into *three* sentencing levels: receiving stolen goods over $2,500 is level VI; receiving stolen goods with a value between $1,000 and $2,500 is severity level V, and receiving stolen goods with a value between $301 and $999 is severity level IV.[1]

The question of value to distinguish a felony from a misdemeanor is not in dispute. The jury's resolution of that can only determine that a felony was committed; which felony and which severity level is the second and important question.

The jury was asked, "Was the value of the 1982 Pontiac $1,000 or more?" It answered, "yes," but that answer is inconclusive as to any value higher than $1,000. If the trial court wished to reserve the right to sentence pursuant to a severity level VI, the jury would have to have been asked another interrogatory directing them to determine if the value of the 1982 Pontiac was $2,500 or more.

The State argues that the record conclusively shows that the Pontiac has a value of over $2,500 and, in fact, had an undisputed value of $5,500. The State is incorrect. The jury's answer to the one interrogatory proved beyond a reasonable doubt that the stolen car had a value of at least $1,000, nothing more.

The State argues that appellant did not object to the jury verdict form which only asked the jury its finding as to a value of $1,000 or more. The State's argument is without merit and, in fact, cuts heavily in appellant's favor. The defendant in a criminal case has no duty to request an additional interrogatory to a jury that could result in his receiving greater punishment. It is the prosecutor's obligation to propose such alternative interrogatories to the court, and the prosecutor failed to do so. The prosecutor cannot now argue that the defendant acquiesced in the prosecutor's oversight and is now exposed to the more severe punishment.

The State further argues that when the question of value of more or less than $2,500 came up at sentencing, appellant's attorney declined the trial court's offer of a sentencing hearing on the value issue and is thus precluded from raising the issue of value on appeal. That argument is without merit. Appellant did submit himself to a factfinder—the jury—on the question of value and the jury returned a verdict incorporating a value of at least $1,000. Appellant here had no duty to submit himself to a second factfinder—the judge—on the question of value when so submitting himself could lead to potential greater punishment. The constitutional provision against double jeopardy can be waived by a defendant, but certainly does not have to be. *State v. White,* 219 N.W.2d 89, 93 (Minn.1974).

We reverse the trial court's decision to set sentence at severity level VI based on property value. We impose the maximum presumptive sentence for a severity level V

1. Under the sentencing guidelines, aggravated forgery (Minn.Stat. 609.525) has three severity levels for sentencing, but neither the statute making aggravated forgery a crime nor the criminal jury instruction guide have severity levels that correspond. The same problem arises with precious metal dealers receiving stolen property (Minn.Stat. 609.53, subd. 1a). The sentencing guidelines provide a different severity level for values in excess of $2500; the statute does not. With these two examples, as with the case at bar, the guidelines are silent as to how a trial judge can keep open the option of sentencing at the highest severity level if there is a conviction.

offense when coupled with a criminal history score of 6 or more, and the additional three months which the trial court added for a person with a custody point and a criminal history score of 6. The sentence is set at 61 months.

## IV.

*Departure*

Appellant contends that a downward durational departure to level V sentencing is warranted because appellant's participation in the sale of the stolen car was minor. Because of our determination that the proper sentencing level was V *ab initio*, we do not discuss this issue.

## DECISION

We affirm the conviction but reverse on the sentence and impose an executed sentence of 61 months.

Affirmed in part and reversed in part.