**STATE of Minnesota, Respondent,**

v.

**Luis Ramirez HERNANDEZ, Appellant.**

**No. C8–86–597.**

Court of Appeals of Minnesota.

Nov. 4, 1986.

Review Denied Dec. 17, 1986.

Hubert H. Humphrey III, Atty. Gen., Thomas Foley, Ramsey Co. Atty., Steven C. DeCoster, Asst. Co. Atty., St. Paul, for respondent.

C. Paul Jones, State Public Defender, Mollie G. Raskind, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by POPOVICH, C.J., and PARKER and HUSPENI, JJ., with oral argument waived.

## OPINION

PARKER, Judge.

Appellant Luis Hernandez was convicted of distribution of cocaine and sentenced to 25 months in prison. He appeals the conviction on the ground of insufficiency of evidence. We affirm.

## FACTS

Sergeant Jerome Jung of the St. Paul Police Department Narcotics Unit had been conducting an undercover investigation on Carlos Martinez for several months prior to October 1985. In the course of the investigation he had purchased a controlled substance from Martinez. Because Martinez had no phone, Jung would contact him by calling a phone number which was reg-istered to 698 Kansas Avenue in St. Paul, two houses away from Martinez's residence at 441 Page Avenue. Appellant Luis Hernandez lived at the Kansas Avenue address, along with his girlfriend, Elvira Lasoya, their daughter, and several other people.

In a phone conversation with Sergeant Jung on October 1, 1985, Martinez indicated that he had cocaine available for sale at $2,400 per ounce, and Jung agreed to purchase three ounces. When Jung tried to call Martinez back on that same day, he had the following conversation with an unknown male who was later identified as Hernandez:

JUNG: Okay, ah, do you know what [Martinez and I] were talking about?

[HERNANDEZ]: Yeah.

JUNG: Okay, tell them that I can't get the money until tomorrow, okay?

[HERNANDEZ]: Okay.

JUNG: And that, ah, I'm probably willing to do, like two or three ounces maybe sometime tomorrow after six o'clock.

[HERNANDEZ]: All right.

JUNG: Ah, do you know how much it's gonna be an ounce?

[HERNANDEZ]: Ah, I don't know, I think it's, ah, twenty-four.

JUNG: You think it's twenty-four, huh?

[HERNANDEZ]: Uh huh.

JUNG: Okay. And I don't want to have to wait for it now or anything. I'll have it right away?

[HERNANDEZ]: Yeah.

The next day, Jung again attempted to contact Martinez at the usual number and spoke instead to Hernandez, who agreed to give Martinez a message to call Jung back. Jung eventually contacted Martinez that day, and arrangements were made for the cocaine purchase. Martinez told Jung to pick him up so they could go to meet the person who had the cocaine. That evening Jung picked up Martinez as arranged and was told to drive to a church parking lot to meet the cocaine supplier and conduct the sale.

Meanwhile, Hernandez and Juan Sevilla had driven to the parking lot to meet Jung and Martinez. Sevilla and Martinez left their cars and spoke briefly. The men then got back into the cars, and Martinez directed Jung to drive to a new location in order to complete the sale, apparently because Hernandez had warned the others of the presence of Officer Richard Freichels, who was at the scene to provide backup and who had previously arrested Hernandez.

Martinez told Jung to drive to a dead end on Page Avenue, where they were met a few minutes later by Sevilla and Hernandez. Martinez again left Jung's car. Sevilla and Hernandez approached Martinez to shake his hand and then slid into the back seat of Jung's car. Martinez got into the front passenger's seat, and the four men began to discuss the cocaine transaction. Jung was told that Hernandez had the cocaine and that the price was still $2,400 per ounce. When Jung asked to see the cocaine, a paper sack was passed to Martinez from the back seat. Because it was dark, Jung could not tell whether the sack was passed by Sevilla or by Hernandez.

As the men sat in the car, Jung turned on the dome light and tested the cocaine by mixing it with a jar of Chlorox bleach. The other men had never seen this testing procedure before, so they watched closely as the cocaine tested positively. Jung pronounced the cocaine to be "dynamite" and said he would get the money out of the trunk and come back to complete the transaction inside the car.

Jung left the vehicle, which was the signal for the other officers to make the arrest. He then opened the trunk of the car and waited for the other officers to arrive. When they did not arrive after about one minute, Jung drew his revolver, identified himself as a police officer, and advised the men that they were under arrest. At that time, the other officers arrived, and the three men were arrested.

After the arrest, the car in which Sevilla and Hernandez had arrived was found nearby at 698 Kansas Avenue, where Hernandez lived and where the phone used to contact Martinez was located.

After the arrests were made, Jung requested a search warrant for the house on Kansas Avenue. During the two-hour delay between the arrests and the search, Sergeant Andrew Gohl of the St. Paul Police Department stood watch outside the house. Although the house appeared to be empty, Hernandez's girlfriend, Elvira Lasoya, came out to the door after an hour and let Gohl wait inside for the warrant. Lasoya had been told of the arrests by a neighbor boy and had seen Gohl outside, but had not made her presence known until she came to the door.

The subsequent search revealed several items commonly used in connection with the manufacture and sale of drugs, including a small scale and sifter, as well as several bottles, plastic bags, and paper packets containing white powder and/or white residue.

Hernandez was eventually charged with two separate crimes: distribution of cocaine and possession with intent to distribute. Minn.Stat. §§ 152.09, subd. 1(1); 152.02, subd. 2; 152.15, subd. 1(1); and 609.05 (1984).

Hernandez pled guilty to the charge of possession with intent to distribute, but later was allowed to withdraw his plea when he contended that it was coerced by a threat to notify immigration authorities.

After a jury trial, Hernandez was found guilty of both charges. He was sentenced to 25 months in prison for the distribution charge. No sentence was imposed for the charge of possession with intent to distribute because it was deemed to be a lesser-included offense. Hernandez appeals, alleging that the evidence was insufficient to support the guilty verdict.

## ISSUE

Was the evidence sufficient to support appellant's conviction for distribution of cocaine?

## DISCUSSION

An appellate court's role in reviewing a claim of insufficiency of evidence has been described by the Minnesota Supreme Court as follows:

[W]e are limited to ascertaining whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged. We cannot retry the facts, but must take the view of the evidence most favorable to the state and must assume that the jury believed the state's witnesses and disbelieved any contradictory evidence. If the jury, giving due regard to the presumption of innocence and to the state's burden of proving the defendant's guilt beyond a reasonable doubt, could reasonably have found the defendant guilty, that verdict will not be reversed.

*State v. Merrill*, 274 N.W.2d 99, 111 (Minn. 1978) (citations omitted).

Viewing the facts in the light most favorable to the State, there was sufficient evidence to conclude reasonably that Hernandez was guilty of the offense charged. First, the October 1 telephone conversation between Jung and Hernandez indicated that Hernandez was involved in the drug sale. The voice on the tape of that phone call was identified as that of Hernandez by State's witness Thomas French, who also testified that he had reached Hernandez at the Kansas Avenue phone number in the past. The defense never challenged that identification, except to imply that the person on the phone may have been Sevilla. Sevilla himself, however, denied ever receiving any phone calls at that location.

During the phone call, Hernandez indicated that he "knew what [Jung and Martinez] were talking about" and was willing to relay Jung's messages to Martinez regarding the sale. More importantly, Hernandez quoted Jung the price of $2,400 per ounce for the cocaine, indicating that he was quite knowledgeable of the transaction. *See State v. Barbo*, 339 N.W.2d 905 (Minn.1983) (tape-recorded phone calls

properly admitted into evidence). In addition, he said that Jung could have the cocaine "right away," in effect promising delivery of the drugs. These statements all show that Hernandez played a substantial role in the transaction.

Furthermore, Jung testified that Hernandez was twice identified as the supplier of the cocaine:

Q: Before the cocaine was passed to the front seat of the car, was there some conversation about this cocaine transaction?

A: I had been informed that [Hernandez] was the person who had the cocaine.

\* \* \* \* \* \*

A: I was told that one of the individuals would have it [the cocaine].

Q: Okay. And that any references that Mr. Martinez may have to someone was always as to one person who would have the cocaine?

A: Yeah, he referenced—he made references to [Hernandez] as having the cocaine.

Although the defense implied that it was Sevilla who had supplied the cocaine, there was no evidence to that effect.

Finally, Jung testified that Hernandez was present in Jung's car when the men discussed the cocaine sale and that Hernandez, Martinez, and Sevilla all participated in the conversation:

A: At the time everyone was in the car, I asked if the price was still $2400 an ounce and I was assured that it was.

Q: Were all the people in the car involved in this conversation?

A: Yes, they were. As I was speaking, I was looking over my shoulder and I was really looking at [Hernandez], but I was speaking to everyone that was in the back seat.

The defense argued that Hernandez did not know of the sale when he entered the car and that he left the car as soon as he heard the sale being discussed. However, State's witness Gohl testified that when he and the other backup officers arrived at the

scene to make the arrests, Hernandez was still in Jung's vehicle.

The State also offered into evidence the drugs and drug paraphernalia found at Hernandez's residence. Although the State did not prove that the items belonged to Hernandez, their presence at his residence could support a finding of constructive possession. Constructive possession may be based on a strong probability that defendant was consciously exercising dominion and control over the evidence in question. *See State v. Florine,* 303 Minn. 103, 226 N.W.2d 609 (1975); *see also State v. Simon,* 275 N.W.2d 51 (Minn.1979) (LSD found in appellant's bedroom was sufficient to support conviction for possession).

Even assuming arguendo that the evidence was insufficient to prove that Hernandez personally distributed the cocaine, there was abundant evidence that he aided others in so doing. Hernandez was charged under Minn.Stat. § 609.05 (1984), which provides that "[a] person is criminally liable for a crime committed by another if he intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." *See State v. Grilli,* 304 Minn. 80, 84, 230 N.W.2d 445, 449 (1975) ("If a person's conduct qualifies under [§ 609.05], he is accused as a principal to the crime even though in common-law parlance, his conduct is that of an accessory").

Although there was little evidence directly incriminating Hernandez for distributing the cocaine, direct evidence was not necessary. In a similar case the defendant's conviction for manufacturing or possessing with intent to manufacture marijuana was upheld, even though there was no direct evidence of his guilt. The supreme court held:

> It is true that there was no direct evidence that defendant grew the marijuana or picked it or readied it for drying or dried it, but we believe that the jury properly could infer from the evidence that defendant was connected to one or more of these activities and, therefore,

we conclude that there was sufficient evidence to convict.

*State v. Hague,* 303 Minn. 100, 101, 225 N.W.2d 852, 854 (1975).

Finally, where, as in this case,

> the resolution of a disputed fact turns largely upon an assessment of the relative credibility of witnesses whose testimonial demeanor was observed only by the jury and the trial court, and * * * the trial court has approved the jury's finding, we are obliged to affirm.

*Seidl v. Trollhaugen, Inc.,* 305 Minn. 506, 508, 232 N.W.2d 236, 239 (1975).

### DECISION

There was sufficient evidence to support appellant's conviction for distribution of cocaine.

Affirmed.